STATE OF NORTH CAROLINA v. FERNANDO LOUIS GARCIA, III

No. 504A01

(Filed 25 June 2004)

**1. Homicide—first-degree murder—short-form indictment— bill of particulars—notice**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder under the felony murder rule with attempted rape as the underlying felony, or in the alternative, by denying his motion for a bill of particulars even though defendant contends the short-form indictment used to charge him lacked adequate notice of the underlying felony, because: (1) murder indictments that comply with N.C.G.S. § 15-144 are sufficient to charge first-degree murder on the basis of any theory set forth in N.C.G.S. § 14-17, and therefore, a short-form indictment is sufficient to charge first-degree murder on the basis of felony murder committed during an attempted rape; (2) defendant was not entitled to learn the State's theory of the case by a bill of particulars when the State is not required to choose its theory of prosecution prior to trial; and (3) there was no palpable or gross abuse in this case based on the denial of a bill of particulars when the State's legal theory was not factual information within the meaning of N.C.G.S. § 15A-925(b) and defendant was not denied any information necessary to adequately prepare or conduct his defense.

**2. Confessions and Incriminating Statements—motion to suppress—custody—Miranda warnings**

The trial court did not err in a first-degree murder case by denying defendant's motion to suppress an inculpatory statement made at the police station because defendant was not in custody and Miranda warnings were not required where: (1) defendant was not under arrest and defendant's movement was not restrained to the degree associated with a formal arrest at the time he made the contested statement; (2) after reviewing the totality of circumstances surrounding defendant's interview, the four factors defendant identifies including three pat-downs, a closed interview room door, a detective's statement that defendant's girlfriend had "given him up," and the fact that defendant would not have been able to leave either police car on his own because the rear doors of police vehicles lock automatically, did

not render him in custody; (3) non-communicated subjective suspicions and non-communicated subjective intent of individual officers have no bearing on Miranda analysis; and (4) defendant's case is not analogous to *State v. Buchanan*, 355 N.C. 264, when there was no abruptly elevated security in defendant's case nor did the defendant make the same type of incriminating initial confession.

**3. Jury—selection—excusal for cause—inability to return death sentence**

The trial court did not abuse it discretion in a first-degree murder case by excusing a prospective juror on the ground that she would be unable to return a sentence of death, because: (1) the prospective juror's answers in this case were inconsistent; and (2) the trial court was well equipped to discern whether the prospective juror's beliefs would substantially impair the performance of her duties to fairly consider aggravating and mitigating circumstances, to weigh those circumstances consistent with the trial court's instructions, and to exercise guided discretion in returning an appropriate sentence.

**4. Jury—selection—questioning replacement jurors before approval of panel of twelve**

Although the trial court violated North Carolina's jury selection statute under N.C.G.S. § 15A-1214(f) by requiring defendant to question replacement jurors in a first-degree murder case before the State approved a full panel of twelve individuals, this error was not prejudicial to defendant and was not structural constitutional error because: (1) defendants claiming error in jury selection procedures must show prejudice in addition to a statutory violation before they can receive a new trial; (2) defendant has not complained that the aberrant procedure resulted in a biased jury, an inability to question the prospective jurors, an interference with his right to challenge, or any other defect without which a different result might have been reached; (3) our Supreme Court has previously held, under similar circumstances of juror shortage, that a defendant is not prejudiced by questioning fewer than a full panel of replacement jurors when that defendant has not exhausted his peremptory challenges, and defendant in this case possessed adequate remaining peremptory challenges during both court sessions for which he assigns error; and (4) defendant has failed to show that he was denied a trial by a fair and impartial jury or to show that any other constitutional

error resulted from the jury selection procedure employed at his trial, and defendant did not raise this constitutional issue at trial.

### 5. Homicide—felony murder—attempted rape—motion to dismiss—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss the charge of felony murder based on attempted rape, because: (1) defendant removed his victim from a public area to a secluded location, defendant removed the victim's shorts and underwear, defendant made statements to police concerning rape, and defendant did not run away when the victim resisted; and (2) the evidence presented by the State was sufficient evidence from which a jury could infer defendant's intent to engage in vaginal intercourse with the victim against her will.

### 6. Confessions and Incriminating Statements; Evidence—threat to female detention officer—relevancy

The trial court did not err in a first-degree murder case by overruling defendant's objection to evidence regarding a threat he made to a female detention officer while defendant was in a holding cell, because: (1) defendant failed to raise a constitutional objection to this statement at trial, and constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal; (2) defendant failed to raise a N.C.G.S. § 8C-1, Rule 404 objection to the evidence; and (3) the evidence was relevant since it tended to prove that defendant acknowledged guilt in the death of the victim in this case, and its probative value was not substantially outweighed by the danger of unfair prejudice.

### 7. Sentencing—capital—mitigating circumstances—remorse

Although the trial court erred during a first-degree murder capital sentencing proceeding by excluding evidence of defendant's remorse, the error was harmless beyond a reasonable doubt because: (1) defendant failed to raise this constitutional issue at trial; and (2) other evidence of defendant's remorse that was not specifically objected to by the State was before the jury.

### 8. Sentencing—capital—closing arguments—personal opinions—murder especially heinous, atrocious, or cruel

The trial court did not err in a first-degree murder capital sentencing proceeding by failing to intervene ex mero motu during closing arguments when prosecutors made comments concerning

whether this was an ordinary homicide or exceptionally disturbing and that "it doesn't get any worse than what you've seen in this case" even though defendant contends those comments represented the improper personal opinions and extra-record knowledge of the prosecutors, because: (1) the statements of prosecutors represented permissible argument regarding a matter in issue, which was the existence or nonexistence of the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel; (2) prosecutors properly drew reasonable inferences about the degree of brutality accompanying the victim's murder, explained those inferences to the jury, and argued that the jury should conclude that the killing committed by defendant was especially heinous, atrocious, or cruel; (3) prosecutors did not urge their personal beliefs to the jury, but instead reminded jurors that they must make an independent decision; and (4) prosecutors did not venture outside the record to inject facts of their own knowledge, but instead properly limited their argument to conclusions derived from facts in evidence.

## 9. Sentencing—capital—death penalty proportionate

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) defendant was convicted based upon the felony murder rule with the underlying felony being attempted rape, and our Supreme Court has held that murders committed during the perpetration of a sexual assault may be more deserving of the death penalty; (2) the jury found the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel; and (3) evidence presented by the State suggested that the victim was conscious during much of the attack, that the attack took place over a period of time, and that the nature and extent of the blows inflicted upon the victim were mutilating.

Justice EDMUNDS concurring.

Justice ORR dissenting.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Howard E. Manning, Jr. on 19 April 2001 in Superior Court, Wake County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 13 October 2003.

STATE v. GARCIA

[358 N.C. 382 (2004)]

*Roy Cooper, Attorney General, by William P. Hart, Special Deputy Attorney General, for the State.*

*Rudolf Maher Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for defendant-appellant.*

BRADY, Justice.

Juliann Bolt was murdered in the ladies' room of her apartment complex clubhouse on 21 June 2000. On 10 July 2000, defendant Fernando Louis Garcia, III[1] was indicted for the first-degree murder of Bolt. Defendant was tried capitally and was found guilty of first-degree murder under the felony murder rule, with attempted rape as the underlying felony. Following a capital sentencing proceeding, the jury recommended that defendant be sentenced to death, and the trial court entered judgment in accordance with that recommendation. Defendant appealed his conviction and sentence pursuant to N.C.G.S. § 7A-27(a), and this Court heard oral argument in defendant's case on 13 October 2003. After consideration of the assignments of error raised by defendant on appeal and a thorough review of the transcript, the record on appeal, the briefs, and oral arguments, we find no error meriting reversal of defendant's capital conviction or death sentence.

At trial, the State's evidence tended to show that both defendant and Bolt resided at Cameron Lakes Apartments in Raleigh, North Carolina. Shortly after 8:00 p.m. on 21 June 2000, Bolt went to the apartment clubhouse intending to exercise in the workout area. The workout room had glass walls, doors, and windows and adjoined a hallway that led to the men's and ladies' restrooms. Defendant, who did not know Bolt, entered the workout area. He escorted Bolt from the room, across the hallway, and into the ladies' restroom at gunpoint. Once inside, defendant forced Bolt to remove her gym shorts and underwear. Defendant struck Bolt with his revolver. He made her lie face down on the restroom floor and pinned her in that position by placing his knee on her back. At some point, Bolt tried to kick at defendant's groin. Defendant continued beating Bolt with the revolver, cracking open her skull and dislodging the right frontal lobe of her brain. When defendant left the restroom, Bolt was bloodied, lying on the restroom floor, and making gurgling sounds.

---

1. We note that the judgment and commitment refers to the defendant as "Fernando Louis Garcia, III," while other documents sometimes refer to the defendant as "Fernando Luis Garcia, III." In order to remain consistent, we refer to him as "Fernando Louis Garcia, III."

Defendant then went to the men's restroom where he discarded his underwear, which had become bloody. He discarded his T-shirt in a dumpster outside the clubhouse and returned to his apartment to wash his tennis shoes and sweat pants. At the apartment, defendant also cleaned the revolver with alcohol and hid it under his bed.

Defendant was convicted primarily on the basis of his own confession and physical evidence, including blood evidence, DNA evidence, shoe prints, fingerprints, his bloody clothing, fresh scratches on his face, knee, back, and nose, and the murder weapon (which had been recovered by police), as well as the testimony of crime scene investigators, a blood spatter analyst, and a pathologist. During the guilt-innocence phase of his trial, defendant called one witness, Dr. Andrew Paul Mason, a toxicologist who testified that forty hours after the murder defendant's blood contained trace amounts of cocaine. Dr. Mason also expressed his expert opinion that, at the time of the murder, defendant had recently used and was under the influence of cocaine. Dr. Mason further testified that cocaine use facilitates violent behavior.

Additional relevant facts will be presented when necessary to resolve specific assignments of error raised by defendant.

## PRE-TRIAL ISSUES

[1] Defendant contends that the trial court erred by denying his motion to dismiss the first-degree murder charge against him and, in the alternative, by denying his motion for a bill of particulars. Defendant argues that he lacked notice as to which underlying felony or felonies supported the felony murder count because he was charged in a short-form indictment. Defendant contends that the absence of such notice is a jurisdictional defect requiring dismissal of his case. Defendant further contends that if the indictment is constitutional, it is vague and should have been supplemented by a bill of particulars which sets forth the felonies upon which the State intended to rely at trial. We disagree.

We note at the outset that information obtained through a bill of particulars cannot remedy a constitutionally infirm indictment. *State v. Greer*, 238 N.C. 325, 331, 77 S.E.2d 917, 922 (1953); *State v. Gibbs*, 234 N.C. 259, 261, 66 S.E.2d 883, 885 (1951). However, we do not find defendant's indictment to be defective. Short-form indictments for homicide are authorized by N.C.G.S. § 15-144, which states:

In indictments for murder and manslaughter, it is not necessary to allege matter not required to be proved on the trial; but in the body of the indictment, after naming the person accused, and the county of his residence, the date of the offense, the averment "with force and arms," and the county of the alleged commission of the offense, as is now usual, it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law . . . and any bill of indictment containing the averments and allegations herein named shall be good and sufficient in law. . . .

N.C.G.S § 15-144 (2003). It is well settled that short-form indictments authorized by section 15-144 meet state and federal constitutional requirements. *See State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702 (2003); *see also State v. Mitchell*, 353 N.C. 309, 328-29, 543 S.E.2d 830, 842, *cert. denied*, 534 U.S. 1000, 151 L. Ed. 2d 389 (2001); *State v. Davis*, 353 N.C. 1, 44-45, 539 S.E.2d 243, 271 (2000), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 55 (2001); *State v. Braxton*, 352 N.C. 158, 173-75, 531 S.E.2d 428, 436-38 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Wallace*, 351 N.C. 481, 504-08, 528 S.E.2d 326, 341-43, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). More specifically, this Court has consistently held that murder indictments that comply with N.C.G.S. § 15-144 are sufficient to charge first-degree murder on the basis of *any theory* set forth in N.C.G.S. § 14-17. *Braxton*, 352 N.C. at 174, 531 S.E.2d at 437; *State v. May*, 292 N.C. 644, 661, 235 S.E.2d 178, 189, *cert. denied*, 434 U.S. 928, 54 L. Ed. 2d 288 (1977). N.C.G.S. § 14-17 states that "[a] murder . . . which shall be committed in the perpetration or attempted perpetration of any arson, *rape* or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree." N.C.G.S. § 14-17 (2003) (emphasis added). Therefore, a short-form indictment is sufficient to charge first-degree murder on the basis of felony murder committed during an attempted rape. Because defendant was convicted of felony murder predicated upon attempted rape, and because defendant was charged in a short-form indictment in compliance with N.C.G.S. § 15-144, we find the indictment to be constitutionally sufficient. For these reasons, the trial court correctly denied defendant's motion to dismiss.

Concerning defendant's motion for a bill of particulars, a defendant may request a bill of particulars "to supplement the facts con-

tained in the indictment." *State v. Randolph*, 312 N.C. 198, 210, 321 S.E.2d 864, 872 (1984). The purpose of a bill of particulars is to "inform [the] defendant of specific occurrences intended to be investigated at trial" and "to limit the course of the evidence to [that] particular scope of inquiry." *State v. Young*, 312 N.C. 669, 676, 325 S.E.2d 181, 186 (1985). To those ends, N.C.G.S. § 15A-925(b) requires that "[a] motion for a bill of particulars must request and specify items of *factual information* desired by the defendant which pertain to the charge and which are not recited in the pleading." N.C.G.S. § 15A-925(b) (2003) (emphasis added). However, when first-degree murder is charged, the State is not required to elect between theories of prosecution prior to trial. *State v. Wingard*, 317 N.C. 590, 594, 346 S.E.2d 638, 641 (1986). Moreover, when the factual basis for prosecution is sufficiently pled, "a defendant must be prepared to defend against any and all legal theories which [the] facts may support." *State v. Holden*, 321 N.C. 125, 135, 362 S.E.2d 513, 522 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988).

The grand jury indictment in this case charged defendant with "FIRST DEGREE MURDER . . . in violation of G.S. § 14-17." Under section 14-17, the State may prove first-degree murder by presenting evidence to support one of several theories, including "deliberate[] and premeditated killing" and killing "committed in the perpetration or attempted perpetration" of an enumerated felony. N.C.G.S. § 14-17. By requesting that the State identify which predicate felony it intended to prove at trial, defendant essentially sought disclosure of the State's legal theory. At the pre-trial hearing, defense counsel explained, "[W]e asked what is the *state's theory*, whether it be premeditation, deliberation, or felony murder, and if it is felony murder, what are the felonies upon which they rely?" (emphasis added). Such legal theories of the prosecution are not "factual information" within the meaning of N.C.G.S. § 15A-925. *Cf. State v. Brown*, 306 N.C. 151, 184, 293 S.E.2d 569, 590 (noting that "G.S. 15A-925 does not authorize a trial court to order the State to disclose its aggravating circumstances prior to trial" because "aggravating circumstances are not 'factual information' within the meaning of G.S. 15A-925"), *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982); *Young*, 312 N.C. at 676, 325 S.E.2d at 186 (because aggravating circumstances are not " 'factual information' within the meaning of N.C.G.S. § 15A-925(b)[,] . . . [t]he trial court did not err in failing to require the State to list in a bill of particulars [the] aggravating circumstances it intended to prove"). The State is not required to choose its theory of prosecution prior to

trial. Accordingly, defendant was not entitled to learn the State's theory of the case by a bill of particulars.

Moreover, N.C.G.S. § 15A-925(b) states that a motion for a bill of particulars "must allege that the defendant *cannot adequately prepare or conduct his defense* without such [requested] information." N.C.G.S. § 15A-925(b) (emphasis added). However, it is apparent from the transcript that defendant knew the State possessed at least some evidence to support a conviction for felony murder based upon robbery or attempted rape. In particular, defense counsel raised the subject later in the pre-trial hearing, expressing his position that there was insufficient evidence to prove that either rape or sexual offense had taken place and requesting the trial court to limit discussion of those felonies during opening arguments. Defense counsel stated, "Well, I'm concerned actually about the state taking the jury out on the theory that we're going to show you, for example, a robbery occurred, a sexual offense occurred, when there's no evidence to support those. And that case would not go to the jury on felony murder based on those potential felonies." In light of counsel's discussion with the trial court, there does not appear to be any factual information later introduced at trial which was beyond defendant's knowledge and necessary to enable defendant to "adequately prepare or conduct his defense." *Id.* To the contrary, the record shows that the State voluntarily provided defendant with open file discovery. During the pre-trial hearing, the prosecutor assured the court "[a]nd again I'm telling the [c]ourt we're giving them open file," indicating that the State had fully complied with the mandates of N.C.G.S. § 15A-903 (2003) and N.C.G.S. § 15A-907 (2003).

The granting or denial of a motion for a bill of particulars is a matter soundly within the discretion of the trial court and is not subject to review except in cases of palpable and gross abuse of discretion. *State v. Williams*, 355 N.C. 501, 542, 565 S.E.2d 609, 633 (2002), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003); *Young*, 312 N.C. at 676, 325 S.E.2d at 186. Because the State's legal theory is not factual information within the meaning of N.C.G.S. § 15A-925(b), and because defendant was not denied any information necessary for adequate preparation or conduct of his defense, we do not find palpable and gross abuse in this case. This assignment of error is overruled.

[2] Next, defendant assigns error to the trial court's denial of his motion to suppress an inculpatory statement made at the police station. Defendant argues that he made the statement while he

was in "custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), that no *Miranda* warnings were given, and that the statement should have been suppressed. In support of his position, defendant emphasizes that the statement was made in an interview room at police headquarters, that defendant was transported to the station in the back seat of a locked police car, and that defendant had been patted down three times by police officers. Following careful review of the record, we find that defendant was not in "custody" for purposes of *Miranda* and that *Miranda* warnings were, therefore, not required.

We note at the outset that, under *Miranda*, whether an individual is in custody is a mixed question of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394 (1995). Accordingly, we review the trial court's findings of fact to determine whether they are supported by competent record evidence, and we review the trial court's conclusions of law for legal accuracy and to ensure that those conclusions " 'reflect[] a correct application of [law] to the facts found.' " *State v. Golphin*, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000) (quoting *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997)), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). In doing so, this Court must look first to the circumstances surrounding the interrogation and second to the effect those circumstances would have on a reasonable person. *Thompson*, 516 U.S. at 112, 133 L. Ed. 2d at 394.

The trial court considered defendant's motion to suppress at the pre-trial hearing conducted on or about 19 February 2001. On this matter, the State called, and defense counsel cross-examined, several police officers with whom defendant had contact on the night of the murder. Thereafter, the court entered an order setting forth findings of fact and conclusions of law as follows: Just before 10:00 p.m. on 21 June 2000, an off-duty police officer, D.J. Erhart, and his friend, Matt Natusch, walked into the clubhouse of Cameron Lakes Apartments located at 6200 Rieese Drive in Raleigh, North Carolina. The clubhouse contained a workout room, lockers, and men's and ladies' restrooms, and it connected to an outdoor swimming pool. The men were at the clubhouse to leave a note for the owner of one of the lockers. While Officer Erhart affixed the note, Natusch saw a black female walk into the ladies' restroom. Soon thereafter, both men heard the female scream. They went into the ladies' restroom where they discovered Juliann Bolt's body lying on the floor next to the door. Officer Erhart immediately called the authorities.

Meanwhile, the unidentified female left the clubhouse. Natusch followed her to a nearby apartment within the complex at 4001-2D Guy Circle. He observed her enter the apartment and kept watch until she emerged approximately ten minutes later wearing different clothing. The female then walked back to the clubhouse to speak with police officers who had arrived to investigate.

Detective Brad Kennon, a City of Raleigh police officer, responded to the scene. Detective Kennon interviewed both Officer Erhart and Natusch at his supervisor's request. From Natusch, Detective Kennon learned the address of the black female (now known to be Keisha Maynor). Maynor had returned to the scene and was waiting to be voluntarily transported to the Raleigh City Police Department Headquarters (hereinafter the police station) for questioning.

Thereafter, Detective Kennon walked to Maynor's apartment, located at 4001-2D Guy Circle, where he knocked on the door. Defendant answered wearing only shorts. He appeared to be wet. Detective Kennon asked whether defendant's girlfriend had gone to the pool to report a crime to the police and defendant affirmed that she had. Detective Kennon then informed defendant that his girlfriend Maynor was going to be transported to the police station to give a statement. Defendant asked whether Detective Kennon would like him to go to the police station as well. Detective Kennon replied that sometimes people are more comfortable if they have a family member or friend with them while they are waiting at the police station and that it would be fine if defendant wanted to go. Defendant stated that he wanted to go to the station but would like to get dressed. Detective Kennon engaged in casual conversation with defendant and, while waiting for him to dress, Detective Kennon observed defendant wash his hands and forearms.

After dressing, defendant followed Detective Kennon out of the apartment and locked the door. They walked back to the clubhouse together. On the way, another officer approached Detective Kennon and informed him that there was an outstanding arrest warrant for defendant. Detective Kennon told the officer not to worry about it and that defendant wanted to go sit with his girlfriend at the police station. The officer then walked away, and Detective Kennon and defendant continued their conversation. Defendant mentioned that it was a hot night and that he had been swimming in the clubhouse pool earlier in the evening.

**STATE v. GARCIA**

[358 N.C. 382 (2004)]

At the parking lot, Detective Kennon informed defendant that he already had a full car and that defendant would have to wait for another officer to transport him to the police station. Defendant stated that he understood. Detective Kennon informed Sergeant Kerrigan that defendant wanted to go to the station but needed transportation. Detective Kennon also informed Sergeant Kerrigan that he considered defendant to be suspicious and that an arrest warrant should be served on defendant if he decided to leave. Detective Kennon then drove Officer Erhart and Natusch to the police station.

While waiting for transportation to the police station, defendant was alone. He leaned up against one of the empty patrol cars approximately twenty to thirty feet from the crime scene. Detective Kennon observed defendant standing alone by the patrol car as he drove away from the complex. At no time did Detective Kennon or Sergeant Kerrigan convey their personal suspicions to defendant by word or action.

While defendant waited for transportation, Maynor was already en route to the station. During the trip, Maynor told the transporting officer, Detective Mary Blalock, that her boyfriend (defendant) was involved in the crime. Detective Blalock stopped the car and contacted Lieutenant Ken Mathias at the crime scene to relay that information. Raleigh Police Detective Ken Andrews and Sergeant Paula O'Neil overheard portions of Lieutenant Mathias' conversation with Detective Blalock. Detective Andrews left the crime scene and drove to the police station in order to interview defendant when he arrived. Sergeant O'Neil informed another officer on the scene, Officer Robert Council, that she had information indicating that defendant might be involved in the homicide and that the victim appeared to have sustained a gunshot wound. At that time, defendant remained alone leaning on a police car. No other officers were nearby.

Officer Council shared the information he received from Sergeant O'Neil with his supervisor, Sergeant Mead. Sergeant Mead told Officer Council to ask defendant for permission to pat him down. Officer Council approached defendant and asked if he would mind having a seat in the patrol car while transportation was being arranged. Defendant agreed that would be "fine." Officer Council informed defendant that he was not under arrest but that it was routine department policy and procedure for officer safety to perform a pat-down for weapons before allowing anyone into a police car. Defendant said that a pat-down would be "fine." Another uniformed officer accompanying Officer Council performed the pat-down, and

defendant waited in the back of the patrol car. Officer Council reported back to Sergeant Mead and was told that Corporal McNeil would transport defendant to the station.

Officer Council returned to defendant and told him that a different officer would take him to the station. Officer Council repeated that defendant was not under arrest but asked permission to pat him down again, explaining that defendant was going to be moved to another police car. Defendant consented. At Corporal McNeil's vehicle, defendant was again informed that he was not under arrest but that the transporting officer would like to conduct his own pat-down. Defendant stated that he understood and consented to the search. Corporal McNeil, accompanied by Officer Detric Bond, then drove defendant to the police station. On the way to the station, conversation was polite, lighthearted, and casual. The three talked about cars and an upcoming concert. They arrived at the station around 11:30 p.m.

At the police station, Officer Bond walked in with defendant, and they rode the elevator to the fourth floor, where the investigative division was located. The area was crowded and Officer Bond had difficulty finding defendant a room in which to wait. As Officer Bond was looking for a room, defendant stated that he was thirsty. Officer Bond told defendant that he could go use the water fountain. Defendant walked to the fountain alone and returned to where Officer Bond was standing. Officer Bond then directed defendant to an office that had been converted into a polygraph room. The room was approximately eight feet by ten feet, was carpeted, and contained a desk and chairs. Officer Bond told defendant that someone would be with him shortly and that he would be out in the common area completing paperwork if defendant needed anything. Officer Bond closed the door, but the door remained unlocked at all times. Officer Bond went across the hallway to a desk where he sat to work. The officer's back was to defendant's room, and defendant made no requests of him.

Detective Andrews entered the interview room at approximately 11:57 p.m. to speak with defendant. He was dressed in plain clothes, was not wearing a jacket, and had removed his firearm. Detective Andrews entered the room alone, shook hands with defendant, introduced himself, and thanked defendant for coming in to talk as others at the apartment complex had done. Detective Andrews asked defendant if he needed anything, but defendant responded that he had already had some water.

Detective Andrews asked defendant about his activities that evening. Defendant told Detective Andrews that he had been in the pool earlier that day, from around 2:30 to 4:30 in the afternoon. Defendant further stated that around 6:00 p.m., he went to visit a friend named Tony and that he did not return home until 9:30 p.m. Defendant could not provide any specific details about Tony or how to contact him.

Next, Detective Andrews asked defendant about a cut on his finger. Defendant stated that he had injured his finger on Tony's car door. Detective Andrews told defendant that the information he had provided was different from the information other witnesses from the apartment complex were providing. Defendant stated that he was telling the truth, but Detective Andrews responded that Maynor had "given him up." Defendant requested a drink and a cigarette lighter and said that he had a story for Detective Andrews.

Detective Andrews left defendant in the room alone and went to retrieve a lighter and a beverage for defendant. When Detective Andrews returned, defendant lit a cigarette. Then, defendant gave a detailed confession stating that he had forced "the girl" into the ladies' restroom, made her lie face down on the floor, and beat her with the revolver. Defendant stated that he had intended to rob "the girl," that he did not have sex with her, and that he could not maintain an erection because he had been drinking all day and was high on cocaine. Defendant explained that he had removed the victim's shorts and underwear and pushed up her shirt because he wanted to make the attack look like a rape. Among other specifics, defendant told Detective Andrews where to find his bloody clothes, his tennis shoes, and the revolver. The interview lasted no longer than thirty minutes. At the conclusion of defendant's confession, Detective Andrews left him alone in the room.

The trial court found that defendant was coherent and did not appear to be under the influence of any impairing substance during the interview, that neither Detective Andrews nor defendant raised his voice, that defendant was not threatened, and that no promises were made to defendant. According to the trial court, defendant was never misled, deceived, or confronted with false accusations of evidence. Actually, every request by defendant was granted, including transportation to the police station, water, a soft drink, and a cigarette lighter. At no time was defendant handcuffed. Finally, at the time of his interview, defendant was familiar with the criminal justice

system, having two prior convictions and other charges pending against him in a third matter.

Ultimately, the trial court concluded, as a matter of law, that defendant was not formally arrested or otherwise subjected to a restraint on his freedom of movement to the degree associated with a formal arrest. The court further concluded that a reasonable person in defendant's position would not have understood himself to be under arrest or under formal restraint. Therefore, the court determined that defendant was not in custody for *Miranda* purposes and that Detective Andrews was not required to recite defendant's constitutional rights as outlined by *Miranda*.

*Miranda* protects individuals from the "inherently compelling pressures" of custodial interrogation. *Miranda*, 384 U.S. at 467, 16 L. Ed. 2d at 719. A person is "in custody" for purposes of *Miranda* when it is apparent from the "totality of the circumstances" that there is a " 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *State v. Buchanan*, 353 N.C. 332, 339, 543 S.E.2d 823, 828 (2001) (*Buchanan I*); *accord California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279 (1983) (per curiam). Because *Miranda* warnings are implemented to prevent coerced self-incrimination, *Dickerson v. United States*, 530 U.S. 428, 435, 147 L. Ed. 2d 405, 414 (2000) ("[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.' ") (quoting *Miranda*, 384 U.S. at 439, 16 L. Ed. 2d at 704), custody analysis examines the interrogation subject's point of view, *Stansbury v. California*, 511 U.S. 318, 323-24, 128 L. Ed. 2d 293, 299 (1994) (per curiam) ("[U]nder *Miranda* '[a] policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time'; rather, 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.' ") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 82 L. Ed. 2d 317, 336 (1984)) (alterations in original). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323, 128 L. Ed. 2d at 298. We must therefore determine whether, based upon the trial court's findings of fact, a reasonable person in defendant's position would have believed that he was under arrest or was restrained in his move-

STATE v. GARCIA

[358 N.C. 382 (2004)]

ment to that significant degree. *Buchanan I*, 353 N.C. at 339-40, 543 S.E.2d at 828.

Defendant is an adult male who has prior experience with the criminal justice system in this state. He was transported to the police station at his own request. While waiting for transportation, defendant was generally alone. Although defendant was frisked before entering any police vehicle, officers explained the reason for the pat-downs and carried them out with defendant's consent. During this process, Officer Council twice informed defendant that he was not under arrest.

The trial court noted that defendant's conversation was polite, lighthearted, and casual while en route to the police station. Upon arrival, he was free to move about unescorted to get a drink of water from the fountain. Thereafter, defendant was asked to wait in an unlocked interview room. A plain-clothed, unarmed officer conducted defendant's interview. At no time did either party raise his voice. Defendant was not threatened in any way, and no promises were made to him. He was not handcuffed at any time preceding, during, or immediately following the interview. Each of defendant's requests was granted, and in fact, Detective Andrews took a break during the interview to fulfill them. Given these circumstances, we agree with the trial court that defendant was not under arrest and that defendant's movement was not restrained to the degree associated with a formal arrest at the time he made the contested statement.

Defendant argues that a reasonable person subjected to three pat-downs, a closed interview room door, and Detective Andrews' statement that Maynor had "given him up" would believe himself to be under arrest or restrained in movement to that degree. Defendant also points out that he would not have been able to leave either police car on his own because the rear doors of police vehicles lock automatically. However, no single factor controls the determination of whether an individual is "in custody" for purposes of *Miranda*. *State v. Barden*, 356 N.C. 316, 338, 572 S.E.2d 108, 124 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). We are persuaded that, after reviewing the totality of circumstances surrounding defendant's interview, the four factors defendant identifies did not render him in custody as defined by *Miranda*.

Defendant also emphasizes that Detective Kennon suspected him of participation in the homicide. It is well settled that non-communi-

cated subjective suspicions and the non-communicated subjective intent of individual officers have no bearing on *Miranda* analysis. *Stansbury*, 511 U.S. at 324, 128 L. Ed. 2d at 299 ("[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*."). Here, the trial court found, based upon ample evidence, that Detective Kennon's personal suspicions were not communicated to defendant. Additionally, the transcript indicates that all discussions about defendant's possible involvement were limited to law enforcement officers and took place out of defendant's hearing. In fact, when informed of an outstanding warrant on defendant in defendant's presence, Detective Kennon told the informing officer not to worry about it. Because Detective Kennon's suspicions were not communicated to defendant, they are irrelevant to our inquiry.

Finally, defendant argues that his case is analogous to *State v. Buchanan*, 355 N.C. 264, 559 S.E.2d 785 (2002) (*Buchanan II*) (per curiam), in which this Court upheld a trial court ruling suppressing incriminating statements by a defendant.[2] Defendant's reliance on *Buchanan II* is misplaced.

In *Buchanan*, the suspect admitted during a station-house interview to participation in a homicide. *Buchanan I*, 353 N.C. at 334, 543 S.E.2d at 825. Specifically, the suspect stated that he engaged in a drunken confrontation with the two victims before he "just went berserk," took the shotgun off a rack on the wall, and started shooting. *Id.* Shortly thereafter, the suspect asked to use the restroom. *Id.* His request was granted, and the suspect went to the restroom accompanied by the two police interrogators, one of whom was in uniform and carried a firearm. *Id.* at 334-35, 543 S.E.2d at 824-25. (Prior to the interrogation, the investigating officer had allowed the

---

2. *Buchanan*, which this Court has twice reviewed on appeal, involved the question of whether a suspect was in custody for purposes of *Miranda* at the time he made an incriminating statement. *Buchanan II*, 355 N.C. at 265, 559 S.E.2d at 785. *Buchanan I* was originally heard by this Court on 17 October 2000. *Buchanan I*, 353 N.C. at 332, 543 S.E.2d at 824. On 6 April 2001, this Court remanded that case, instructing the trial court to make additional findings of fact and to draw new conclusions of law considering only those circumstances surrounding the defendant's interrogation which "would contribute to an objective determination that [the] defendant's freedom of movement was restrained to the degree associated with a formal arrest." *Id.* at 342, 543 S.E.2d at 830. On remand, the trial court added two findings of fact to its previous findings and under the proper test reassessed the circumstances surrounding the defendant's interrogation. *Buchanan II*, 355 N.C. at 265, 559 S.E.2d at 785. We affirmed the trial court's new conclusions of law on appeal. Id. at 265, 559 S.E.2d at 785-86.

suspect to use the restroom and to get a drink of water by himself.) *Id.* at 334, 543 S.E.2d at 824. Upon returning to the interrogation room, the suspect signed a written copy of his first statement and made a second statement further incriminating himself. *Id.* at 335, 543 S.E.2d at 825. After this second statement was reduced to writing and signed by the suspect, he was arrested and given *Miranda* warnings. *Id.* Thereafter, the interviewing officers filled out a *Miranda* waiver form, which the suspect also signed. *Id.* The trial court suppressed "any statements [the suspect] made between the time he returned from the bathroom until *Miranda* warnings were properly administered," *Buchanan II*, 355 N.C. at 265, 559 S.E.2d at 785, and this Court affirmed. *Id.* at 265, 559 S.E.2d at 785-86.

In the present case, defendant gave a single incriminating statement to a plain-clothed, unarmed detective. Although a recess was taken during both the interrogation in *Buchanan* and defendant's questioning in the present case, the break in *Buchanan* was accompanied by circumstances that would cause a reasonable person to believe he was under arrest or that his movement had been restrained to that degree. In *Buchanan*, the presence of two interrogating officers, one of whom was uniformed and armed, escorting the suspect to the restroom represented a heightened level of security and a marked shift in the tone of the suspect's station-house interview. The changed nature of the suspect's relationship with the interviewing officers would have been especially apparent because the facts of *Buchanan* indicate that before giving his first inculpatory statement, the suspect was allowed to visit the restroom and get a drink of water by himself. Also, the suspect in *Buchanan* had a second compelling reason to believe he was under arrest, having just confessed to two police officers that he had become "berserk" and shot two people to death in their bedroom. Indeed, the facts of *Buchanan* show that the suspect's preliminary statement prompted the officers to accompany him to the men's restroom.

We find no such abruptly elevated security in the defendant's case nor did the defendant make the type of incriminating initial confession as did the suspect in *Buchanan*. Instead, we reiterate that custody analysis, for purposes of *Miranda*, is dependent upon the unique facts surrounding each incriminating statement. *Barden*, 356 N.C. at 337, 572 S.E.2d at 123 ("The proper inquiry for determining whether a person is 'in custody' for purposes of *Miranda* is 'based on the *totality of the circumstances*, whether there was a "formal arrest or restraint on freedom of movement of the degree associated

with a formal arrest." ' ") (quoting *Buchanan I*, 353 N.C. at 339, 543 S.E.2d at 828) (emphasis added). This Court reviews those facts and circumstances together as a whole because the effect on a reasonable person is best discerned from context. No one factor is determinative.

Based upon the totality of the circumstances, we hold that a reasonable person in defendant's position would not have believed that he was under arrest or that his freedom of movement was restrained to the degree of a formal arrest. We conclude that the trial court's findings of fact are supported by competent record evidence, and that the court properly applied the law to those facts. Defendant was not in custody when he made the contested statements; therefore, the police were not required to give *Miranda* warnings. This assignment of error is overruled.

## JURY SELECTION

[3] Next, defendant sets forth two assignments of error arising from the jury selection process, which he contends entitle him to a new trial. First, defendant argues that the trial court erred by excusing prospective juror, Beth Bond, on the ground that she would be unable to return a sentence of death. Defendant argues that despite Bond's personal views opposing the death penalty, her testimony indicated that she would be able to follow the law and to vote to return a verdict recommending the death sentence if appropriate. Therefore, defendant contends that the trial court violated his constitutional right to an impartial jury. We disagree.

During *voir dire*, Bond stated that she had "been opposed to capital punishment all of [her] adult life, and in terms of public policy." She explained that she had held these beliefs for thirty-one years. Upon questioning by the prosecutor as to whether she could vote "under any circumstance" to impose a death sentence, Bond replied in part, "I'm uncertain. That's as honest an answer as I can give you. . . . I would probably work hard to find some other way than that, but I can't say to you, no, I would not apply the law. I can't." When asked to repeat her statement, Bond said, "I can't say to you I absolutely would not; if I were seated, I would have to." Bond explained the "public policy" reasons for which she opposed the death penalty and agreed that she would be predisposed to vote for life without parole "[i]f [she could] do that in [her] mind and apply the law."

Thereafter, the court questioned Bond. When asked directly whether she could give both sides the benefit of a "level playing

field," Bond responded, "The State would not be in a hole; it would be in [an] indentation, though, and that's the honest truth." The court then excused Bond for cause.

The United States Supreme Court first addressed the constitutionality of excluding prospective jurors who express uneasiness about participation in the imposition of a death sentence in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968). In *Witherspoon*, the Supreme Court examined an Illinois statute that allowed challenges for cause "of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same" in murder trials. *Id.* at 512, 20 L. Ed. 2d at 779. Concluding that "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror," the Court struck down the statute and granted the defendant a new trial. *Id.* at 519, 20 L. Ed. 2d at 783.

In *Adams v. Texas*, the Supreme Court clarified *Witherspoon*, as a "limitation on the State's power to exclude [jurors]," 448 U.S. 38, 48, 65 L. Ed. 2d 581, 591 (1980), but recognized "the State's legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." *Id.* at 44, 65 L. Ed. 2d at 589. Thus, the Court stated, "This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* 448 U.S. at 45, 65 L. Ed. 2d at 589. The United States Supreme Court confirmed *Adams* as the proper standard to be applied when a juror's personal opposition to the death penalty becomes apparent. *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851 (1985) ("We therefore take this opportunity to clarify our decision in *Witherspoon*, and to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment.").

Our General Assembly effectively codified *Wainwright* in N.C.G.S. § 15A-1212(8), which states that any juror who, "[a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina" may be challenged for cause. N.C.G.S. § 15A-1212(8) (2003). Additionally, in *State v. Cummings*, this Court applied *Wainwright*, listing several "sworn duties of a

juror in a capital sentencing hearing" in North Carolina. 326 N.C. 298, 306, 389 S.E.2d 66, 70 (1990). As explained in *Cummings*, a capital juror's duties include "consideration of aggravating and mitigating circumstances, weighing such circumstances under the court's instructions, and exercising the guided discretion necessary for a reliable sentence." *Id.* Under *Wainwright*, *Cummings*, and N.C.G.S. § 15A-1212(8), if personal beliefs substantially impair a juror's ability to carry out these duties, that juror may properly be excused for cause.

In *Wainwright* the United States Supreme Court recognized that the law leaves

> trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial.

469 U.S. at 421, 83 L. Ed. 2d at 850. In this task, the United States Supreme Court provided guidance. The Court emphasized that trial judges are uniquely positioned to observe the demeanor, credibility, and state of mind of a prospective juror. *Id.* at 428, 83 L. Ed. 2d at 854. As such, findings based upon those observations are "peculiarly within a trial judge's province" and are "entitled to deference even on direct review." *Id.* Further, the proper standard, as noted by the Court in *Wainwright*,

> does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. . . . [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424-26, 83 L. Ed. 2d at 852-53 (footnote omitted). For these same reasons, this Court consistently applies abuse of discretion as the standard of review when a defendant argues that the trial court erred by excusing a juror solely because of that juror's personal views opposing the death penalty. *See State v. Berry*, 356 N.C. 490, 500, 573 S.E.2d 132, 141 (2002) ("In light of [the prospective juror's] final assertion that he could not follow the law if the evidence were circumstantial, the trial court did not abuse its discretion in excusing him for cause."); *State v. Kemmerlin*, 356 N.C. 446, 461-62, 573 S.E.2d 870, 883 (2002) ("[W]e ordinarily 'defer to the trial court's judgment as to whether the prospective juror could impartially follow the law.' ") (quoting *State v. Morganherring*, 350 N.C. 701, 726, 517 S.E.2d 622, 637 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000)); *State v. Wiley*, 355 N.C. 592, 608-10, 565 S.E.2d 22, 35-36 (2002) (applying the abuse of discretion standard to the excusal of a prospective juror for cause based upon that juror's views about the death penalty), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003).

Furthermore, we have declined to find abuse of discretion in these cases when prospective jurors' responses are inconsistent or when jurors' answers regarding their ability to follow the law are equivocal. *See Berry*, 356 N.C. at 500, 573 S.E.2d at 141 (concluding the trial court did not abuse its discretion by excusing a prospective juror for cause because his responses were "not consistent during *voir dire*, in that he sometimes stated that he could follow the law, while other times he qualified his answers by adding that he would require more than circumstantial evidence" to recommend a sentence of death); *State v. Jones*, 355 N.C. 117, 122, 558 S.E.2d 97, 101 (2002) (holding the same given the "equivocating nature of [a prospective juror's] responses" during *voir dire*); *State v. Greene*, 351 N.C. 562, 567-68, 528 S.E.2d 575, 578-79 (2000) (concluding the same when a prospective juror gave conflicting answers regarding his ability to impartially follow the law), *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000); *State v. Yelverton*, 334 N.C. 532, 544, 434 S.E.2d 183, 190 (1993) (holding the same when "equivocation in the prospective juror's answers resulted from his expressed, conscientious desire to do his duty as a juror and to follow the trial court's instructions in the face of recognizing his personal inability to impose the death penalty").

Here, Bond's answers were inconsistent. Even though Bond indicated a sincere desire to follow the law, the best Bond was able to tell the court was "I can't say to you, no, I would not apply the

law." Bond told the prosecutor about strong beliefs against the death penalty which she has held for thirty-one years, stating that because of those beliefs, she was "uncertain" as to whether she could return a death sentence under any circumstance. When questioned by the trial judge, Bond communicated clearly that in her mind the prosecution would begin at a disadvantage, which she characterized as "in [an] indentation."

The mixed nature of Bond's responses demonstrates the dilemma articulated in *Wainwright*: *voir dire* does not always elicit concrete answers. *See Greene*, 351 N.C. at 567, 528 S.E.2d at 579 (" 'The conflicting answers given by these prospective jurors illustrate clearly the United States Supreme Court's conclusion that a prospective juror's bias may, in some instances, not be provable with unmistakable clarity.' ") (quoting *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990)). Here, Bond earnestly did not know how she would react when faced with imposing a death sentence. Seeking clarity, the trial judge questioned Bond himself. As a first-person observer of *voir dire*, the trial court was well equipped to discern whether Bond's beliefs would substantially impair the performance of her duties to fairly consider aggravating and mitigating circumstances, to weigh those circumstances consistent with the trial court's instructions, and to exercise guided discretion in returning an appropriate sentence. In light of Bond's apparent inner struggle and the ambiguous and conflicting nature of her responses, we cannot say that the trial judge abused his discretion by discerning bias and excusing her for cause. Accordingly, this assignment of error is overruled.

[4] Next, defendant argues that the trial court violated North Carolina's jury selection statute, N.C.G.S. § 15A-1214(f), and also committed structural constitutional error by requiring defendant to question replacement jurors before the State approved a full panel of twelve individuals. Defendant points to aberrant selection procedure on two separate occasions and argues that such deviations from the statutory method automatically entitle him to a new trial. We disagree.

Jury selection began on 26 March 2001. By Friday, 30 March 2001, the State and defendant had agreed on seven jurors. Even though five replacement jurors were needed to complete the twelve-member jury panel, only four individuals remained in the jury pool. Foreseeing this shortage, the trial judge had announced at close of court the previous

STATE v. GARCIA

[358 N.C. 382 (2004)]

day that "in my discretion, as I have already said twice, well, it's not fair to [the four individuals left in the jury pool] to dangle them on the hook, because they may very well be on the jury, so we're going to do that tomorrow."

While questioning the remaining four prospective jurors on 30 March 2001, the State successfully challenged one of them for cause, leaving only three jurors to pass to defense counsel for questioning. Defense counsel then conducted *voir dire* without objection, exercising peremptory challenges with respect to two of the candidates and passing one to sit on the jury unchallenged. Upon completing *voir dire* of these three prospective jurors, three of defendant's fourteen peremptory challenges remained unused.

The second incident in question occurred on Monday, 2 April 2001 when four replacement jurors were needed to reach a full panel of twelve. Late that afternoon the State indicated satisfaction with three prospective jurors but then challenged or excused four consecutive candidates. When it became apparent that the State might not select four jurors in time for the defendant to conduct *voir dire* that same day, the judge determined that the State should pass the three jurors it had selected. As a result, those jurors would not need to return to court on the following morning. The judge prefaced his decision with the recognition that

[t]hese three people have been here all day, and in my discretion, unless there are any objections, I would like to go ahead and send home the balance of the panel. And out of a matter of courtesy, let [defense counsel] talk to the three people who you passed, so they'll know one way or the other.

The judge then asked whether "anybody [had] a problem with that," to which defense counsel did not respond. Thereafter, the three prospective jurors were passed to defendant for questioning. Defendant exercised a peremptory challenge as to one candidate and selected the remaining two to serve on the jury. At the close of court on 2 April 2001, defendant had two peremptory challenges remaining.

The General Assembly codified the method by which juries are to be selected in North Carolina in N.C.G.S. § 15A-1214. N.C.G.S. § 15A-1214 (2003). The statute was enacted to ensure uniform jury selection processes throughout the state. N.C.G.S. § 15A-1214 official commentary (2003). Through N.C.G.S. § 15A-1214, the legislature prescribed a selection method during which replacement jurors

are not passed to the defendant until the State accepts a sufficient number of jurors to complete a full panel of twelve. N.C.G.S. § 15A-1214(f). Section 15A-1214 provides in pertinent part:

> (d) The prosecutor must conduct his examination of the first 12 jurors seated and make his challenges for cause and exercise his peremptory challenges. If the judge allows a challenge for cause, or if a peremptory challenge is exercised, the clerk must immediately call a replacement into the box. When the prosecutor is satisfied with the 12 in the box, they must then be tendered to the defendant. Until the prosecutor indicates his satisfaction, he may make a challenge for cause or exercise a peremptory challenge to strike any juror, whether an original or replacement juror.
>
> . . .
>
> (f) Upon the calling of replacement jurors, the prosecutor must examine the replacement jurors and indicate satisfaction with a completed panel of 12 before the replacement jurors are tendered to a defendant . . . This procedure is repeated until all parties have accepted 12 jurors.

*Id.* § 15A-1214(d), (f) (emphasis added).

Defendant now argues that the trial court deviated from the statutorily mandated jury selection process on the two occasions described above. However, defendant did not object to these deviations at trial. Nonetheless, " 'when a trial court acts contrary to a statutory mandate . . . the right to appeal the court's action is preserved.' " *State v. Jaynes*, 353 N.C. 534, 544-45, 549 S.E.2d 179, 189 (2001) (quoting *State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985)), *cert. denied*, 535 U.S. 934, 152 L. Ed. 2d 220 (2002); *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). Accordingly, defendant's statutory assignment of error is preserved for review.

We agree that the procedures employed at trial violated the express requirements of N.C.G.S. § 15A-1214(f). The prosecutor passed less than a full panel of twelve replacement jurors to defendant on two separate occasions. However, a new trial does not automatically follow a finding of statutory error. This Court has consistently required that defendants claiming error in jury selection procedures show prejudice in addition to a statutory violation before they can receive a new trial. *Jaynes*, 353 N.C. at 545, 549 S.E.2d at 190 (Although the trial court deviated from prescribed statutory jury

**STATE v. GARCIA**

[358 N.C. 382 (2004)]

selection procedure, the defendant's assignment of error was overruled "because defendant . . . failed to demonstrate prejudice."); *State v. Hyde*, 352 N.C. 37, 49, 530 S.E.2d 281, 290 (2000) (emphasizing that defendant consented to deviations from statutory jury selection procedures and that "defendant conced[ed] that the trial court's jury selection method did not disadvantage or prejudice him"), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001); *Lawrence*, 352 N.C. at 13, 530 S.E.2d at 815 ("Although the jury selection procedure violated the express requirement of N.C.G.S. § 15A-1214(d) that the State pass a full panel of twelve jurors, defendant has failed to show prejudice."). That is, defendant must prove that a reasonable possibility exists that, had the error not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (2003).

The intended result of jury selection is to empanel an impartial and unbiased jury. *See State v. Williams*, 286 N.C. 422, 427-28, 212 S.E.2d 113, 117 (1975) (providing that jurors should be "free from a preconceived determination to vote contrary to [either party's] contention concerning the defendant's guilt"); *State v. Carey*, 285 N.C. 497, 506, 206 S.E.2d 213, 220 (1974) ("The basic concept in jury selection is that each party to a trial has the right to present his cause to an unbiased and impartial jury."). To that end, the parties conduct *voir dire* which "serves the dual purpose of ascertaining whether grounds exist for challenge for cause and of enabling counsel for the State and for the defendant to exercise intelligently their peremptory challenges." *State v. Simpson*, 341 N.C. 316, 336, 462 S.E.2d 191, 202 (1995), *cert. denied*, 516 U.S. 1161, 134 L. Ed. 2d 194 (1996). Fairness is promoted by ensuring that the defendant has a full opportunity to face jurors, question them, and challenge unsatisfactory candidates. During jury selection, defendants, who question last, reap the benefit of information developed during the State's *voir dire*. *See State v. Harris*, 283 N.C. 46, 51, 194 S.E.2d 796, 799 (noting that a defendant enjoyed "the last opportunity to exercise his right of challenge [after] the State had all pertinent information concerning the fitness and competency of the juror"), *cert. denied*, 414 U.S. 850, 38 L. Ed. 2d 99 (1973).

Although defendant on appeal has stated that prejudice occurred, he has made no attempt, either in written brief or at oral argument before this Court, to show how the identified statutory violation prejudiced his case. Defendant has not complained that the aberrant procedure resulted in a biased jury, an inability to question the prospective jurors, an interference with his right to challenge, or any

other defect without which a different result might have been reached. Having explained *what* happened, defendant has failed to show *how* the incidents in question affected the conduct or outcome of his trial.

Moreover, this Court has previously held, under similar circumstances of juror shortage, that a defendant is not prejudiced by questioning fewer than a full panel of replacement jurors when that defendant has not exhausted his peremptory challenges. *See e.g.*, *Lawrence*, 352 N.C. at 12-13, 530 S.E.2d at 814-15 (finding no prejudice when three more jurors were required, but, because the prosecution had exhausted the jury pool, only one replacement juror was passed to defendant and defendant neither exercised his remaining peremptory challenge nor challenged the passed replacement juror for cause). The number of remaining peremptory challenges is most appropriately measured from the time of the alleged error in jury selection. *Cf. State v. Wilson*, 313 N.C. 516, 524-25, 330 S.E.2d 450, 457 (1985) (determining that defendant, who argued that the sheriff had improperly summoned additional jurors, possessed two unused peremptory challenges at the time the alleged error occurred). If peremptory challenges are unused, and the defendant makes no challenge for cause, then he cannot be said to have been forced to accept an undesirable juror. *Lawrence*, 352 N.C. at 13, 530 S.E.2d at 815.

Here, defendant possessed adequate remaining peremptory challenges during both court sessions for which he assigns error. Following the first deviation from the statutory selection procedure, defendant accepted one juror, but possessed *three* remaining peremptory challenges. Following the second deviation, defendant accepted two jurors, but possessed *two* remaining peremptory challenges. Altogether, defendant exercised only twelve of his fourteen peremptory challenges during jury selection proper. In fact, defendant carried two unused peremptory challenges over into the alternate juror selection process. Although defendant eventually exhausted his peremptory challenges, defendant had multiple challenges available to him during all sessions for which he assigns error. Accordingly, defendant has failed to show prejudice, and his assignment of statutory error is overruled.

Defendant also argues that the improper jury selection procedure amounted to structural error. While defendant's brief is somewhat unclear on this point, we presume that defendant is asserting that the alleged structural error violated his constitutional right to a fair and impartial jury.

Structural error is a rare form of constitutional error resulting from "structural defects in the constitution of the trial mechanism" which are so serious that " 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.' " *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 113 L. Ed. 2d 302, 331 (1991) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 92 L. Ed. 2d 460, 470 (1986)). "Such errors 'infect the entire trial process,' *Brecht v. Abrahamson*, 507 U.S. 619, 630, and '*necessarily* render a trial fundamentally unfair, *Rose*, 478 U.S. at 577.' " *Neder v. United States*, 527 U.S. 1, 8, 144 L. Ed. 2d 35, 46 (1999). For this reason, a defendant's remedy for structural error is not dependant upon harmless error analysis; rather, such errors are reversible *per se. Id.* at 34, 144 L. Ed. 2d at 62. ("The very premise of structural-error review is that even convictions reflecting the 'right' result are reversed for the sake of protecting a basic right.").

Although the United States Supreme Court first defined structural error in 1991, that Court has identified only six instances of structural error to date: (1) complete deprivation of right to counsel, *Johnson v. United States*, 520 U.S. 461, 468-69, 137 L. Ed. 2d 718, 728 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799 (1963)); (2) a biased trial judge, *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749 (1927); (3) the unlawful exclusion of grand jurors of the defendant's race, *Vasquez v. Hillery*, 474 U.S. 254, 88 L. Ed. 2d 598 (1986); (4) denial of the right to self-representation, *McKaskle v. Wiggins*, 465 U.S. 168, 79 L. Ed. 2d 122 (1984); (5) denial of the right to a public trial, *Waller v. Georgia*, 467 U.S. 39, 81 L. Ed. 2d 31 (1984); and (6) constitutionally deficient jury instructions on reasonable doubt, *Sullivan v. Louisiana*, 508 U.S. 275, 124 L. Ed. 2d 182 (1993). *See Johnson*, 520 U.S. at 468-69, 137 L. Ed. 2d at 728 (identifying the six cases in which the United States Supreme Court has found structural error). The Court has also determined that other, arguably serious, constitutional errors were not "harmless beyond a reasonable doubt" before granting a new trial. *See e.g., Neder*, 527 U.S. at 15, 144 L. Ed. 2d at 51 (applying harmless error analysis to a trial court's omission of an element of the offense from the jury charge); *Fulminante*, 499 U.S. at 295, 113 L. Ed. 2d at 322 (applying harmless error analysis to trial court's admission of a coerced confession); and *Rose*, 478 U.S. at 579, 92 L. Ed. 2d at 471 (An "erroneous malice [jury] instruction does not compare with the kinds of errors that *automatically* require reversal of an otherwise valid conviction.") (emphasis added). In fact, the United States Supreme Court emphasizes a

STATE v. GARCIA

[358 N.C. 382 (2004)]

strong presumption *against* structural error, *Rose*, 478 U.S. at 579, 92 L. Ed. 2d at 471 ("If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis"); *See Neder*, 527 U.S. at 8, 144 L. Ed. 2d at 46 ("[W]e have found an error to be 'structural,' and thus subject to *automatic reversal*, only in a 'very limited class of cases.') (quoting *Johnson*, 520 U.S. at 468, 137 L. Ed. 2d at 728), and this Court has recently declined to extend structural error analysis beyond the six cases enumerated by the United States Supreme Court, *State v. Anderson*, 355 N.C. 136, 142-43, 558 S.E.2d 87, 92-93 (2002) (holding that improper prosecutorial questions and comments during *voir dire* are not within the limited class of structural errors defined by the United States Supreme Court).

In each of the six United States Supreme Court cases rectifying structural error, the defendant made a preliminary showing of a violated constitutional right and the identified constitutional violation *necessarily* rendered the criminal trial fundamentally unfair or unreliable as a vehicle for determining guilt or innocence. *See Gideon*, 372 U.S. 335, 9 L. Ed. 2d 799; *Tumey*, 273 U.S. 510, 71 L. Ed. 749; *Vasquez*, 474 U.S. 254, 88 L. Ed. 2d 598; *McKaskle*, 465 U.S. 168, 79 L. Ed. 2d 122; *Waller*, 467 U.S. 39, 81 L. Ed. 2d 31; *Sullivan*, 508 U.S. 275, 124 L. Ed. 2d 182.

Here, defendant has failed to show that he was denied trial by a fair and impartial jury or to show that any other constitutional error resulted from the jury selection procedure employed at his trial. Defendant has shown only a technical violation of the state jury selection statute. Without more, this statutory violation is insufficient to support a claim of constitutional structural error.

Moreover, defendant did not raise this constitutional issue at trial. Consequently, the trial court was denied the opportunity to consider and, if necessary, to correct the error. It is well settled that constitutional matters that are not "raised and passed upon" at trial will not be reviewed for the first time on appeal. *State v. Watts*, 357 N.C. 366, 372, 584 S.E.2d 740, 745 (2003), *cert. denied*, —— U.S. ——, 158 L. Ed. 2d 370, (2004); N.C. R. App. P. 10(b)(1) ("In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion . . ."). Structural error, no less than other constitutional error, should be preserved at trial. *See State v. Roache*, 358 N.C. 243, 595 S.E.2d 381 (2004) (determining that the defendant's assignment of error which alleged that "improper jury

selection procedure violated his constitutional right to a fair and impartial jury" was not raised at trial and, consequently, had not been preserved for appellate review); *cf. Johnson*, 520 U.S. at 466, 137 L. Ed. 2d at 726 (determining that structural error must be preserved for review on direct appeal from judgment of conviction in the federal courts). Accordingly, defendant has not only failed to allege any constitutional error warranting a new trial, but has also failed to preserve this assignment of error for appellate review. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[5] Next, defendant argues that the trial court erred by submitting the charge of felony murder based on attempted rape to the jury. Defendant contends that the State did not introduce sufficient evidence to support his conviction for that crime. Specifically, defendant argues there is insufficient evidence that he intended to "engage in vaginal intercourse with [the victim] by force and against her will." We disagree.

Evidence presented by the State at trial tended to show that on the night of her murder, Bolt was exercising alone in the workout room of her apartment's clubhouse. The room had glass walls, doors, and windows, which allowed people passing by to easily see inside. During his interview with Detective Andrews, defendant admitted to forcing Bolt from the workout area, across a hallway, and into the ladies' restroom at gunpoint.

Bolt's gym shorts and underwear were found on the floor in the end toilet stall. Defendant told Detective Andrews that he had removed Bolt's clothing after the attack; however, her shorts and underwear were not bloodstained. Crime scene photographs and witness testimony showed that Bolt's body, as well as her remaining clothing, including socks and sneakers, were blood-soaked. Blood spatter evidence indicated that defendant began beating Bolt in the last toilet stall.

Defendant told Detective Andrews that he had forced Bolt to her knees, and forensic evidence confirmed that Bolt's knees were bruised and swollen. Next, defendant said that he made Bolt lie on her stomach, pinning her down by placing his knee in her back. Defendant further stated that he became angry and lost control, striking Bolt on the head with the revolver after she tried to kick at the area between his legs.

STATE v. GARCIA

[358 N.C. 382 (2004)]

Following the attack, defendant discarded his underwear in the adjacent men's restroom. Testing revealed that Bolt's blood had soaked into the top front portion of defendant's underwear. The remainder of defendant's underwear was not stained. Defendant told Detective Andrews that his underwear had become bloody because the sweat pants he wore kept slipping down.

Bolt was found lying in the fetal position on the restroom floor. Her hair was flung forward over her head; her shirt was pushed up, and she was naked from the waist down. When asked by Detective Andrews why Bolt was exposed in this manner, the defendant stated that he was trying to make the attack look like a rape. Upon further questioning as to whether he had ejaculated on Bolt, defendant explained that he could not maintain an erection because he had been drinking and was high on cocaine all day.

Defendant moved for a dismissal at the end of the State's case and again at the close of all evidence. Both motions were denied. Defendant then objected to the submission of the felony murder charge to the jury, specifically objecting to felony murder predicated on attempted rape. The trial court overruled defendant's objection and submitted two charges for the jury's consideration: (1) first-degree murder based upon premeditation and deliberation, and (2) first-degree felony murder based upon attempted rape. The jury deliberated and returned a unanimous verdict finding defendant guilty of first-degree murder committed during the perpetration of a felony, the felony being attempted rape.

When a defendant moves to dismiss a charge against him on the ground of insufficiency of the evidence, the trial court must determine "whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996); *see also State v. Smith*, 357 N.C. 604, 615, 588 S.E.2d 453, 461 (2003). "Substantial evidence" is relevant evidence that a reasonable person might accept as adequate, *State v. Squires*, 357 N.C. 529, 535, 591 S.E.2d 837, 841 (2003), or would consider necessary to support a particular conclusion, *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995). A "substantial evidence" inquiry examines the sufficiency of the evidence presented but not its weight. *State v. Sokolowski*, 351 N.C. 137, 143, 522 S.E.2d 65, 69 (1999). The reviewing court considers all evidence in the light most favorable to the State, and the State receives the benefit of every reasonable inference

supported by that evidence. *Squires*, 357 N.C. at 535, 591 S.E.2d at 841. Evidentiary "[c]ontradictions and discrepancies are for the jury to resolve and do not warrant dismissal." *State v. Gibson*, 342 N.C. 142, 150, 463 S.E.2d 193, 199 (1995). Finally, sufficiency review "is the same whether the evidence is circumstantial or direct, or both." *State v. Jones*, 303 N.C. 500, 504, 279 S.E.2d 835, 838 (1981).

Murder committed during the "attempted perpetration of . . . rape" qualifies as first-degree felony murder under N.C.G.S. § 14-17. N.C.G.S. § 14-17. The elements of attempted first-degree rape are: (1) specific intent to rape the victim, and (2) completion of an overt act done for that purpose that goes beyond mere preparation but falls short of the actual commission of the rape. *State v. Bell*, 311 N.C. 131, 140, 316 S.E.2d 611, 616 (1984). Rape can be defined as vaginal intercourse carried out against the will of another person and facilitated by force, during which the offender employed or displayed a dangerous weapon or inflicted serious personal injury upon the victim. N.C.G.S. § 14-27.2 (2003).

Defendant argues that the facts of the present case are similar to those of *State v. Walker*, 139 N.C. App. 512, 533 S.E.2d 858 (2000), in which the Court of Appeals found "the evidence of defendant's [sexual] intent [was], at most, ambiguous." *Id.* at 518, 533 S.E.2d at 861. Initially, we note that, while Court of Appeals decisions may be persuasive authority, "[t]his Court is not bound by precedents established by the Court of Appeals." *Northern Nat'l Life Ins. Co. v. Lacy J. Miller Mach. Co.*, 311 N.C. 62, 76, 316 S.E.2d 256, 265 (1984); *Mazza v. Medical Mut. Ins. Co.*, 311 N.C. 621, 631, 319 S.E.2d 217, 223 (1984). Moreover, we believe that there is significantly more evidence in the present case from which a jury might discern defendant's sexual intent than there was in *Walker*.

In *Walker*, the defendant attacked a woman in a public restroom. 139 N.C. App. at 514, 533 S.E.2d at 859. The evidence in that case indicated that the perpetrator peeked at the woman around a partition, turned off the lights, grabbed her from behind, and forced her to the restroom floor. *Id.* He lay " 'completely on top of' " the woman and told her to roll onto her stomach. *Id.* At one point, the woman felt the attacker's right hand touch her side. *Id.* at 515, 533 S.E.2d at 859. When he could not prevent the woman from screaming, the perpetrator ran away. *Id.* The defendant in *Walker* was tried and convicted for attempted rape; however, the Court of Appeals vacated that conviction. *Id.* at 514, 533 S.E.2d at 859.

Although both defendant and the perpetrator in *Walker* attacked their victims in a ladies' restroom and both forced their victims to lie on their stomachs, only defendant removed his victim from a public area to a secluded location, removed his victim's shorts and underwear, and made statements to police concerning rape. Unlike the perpetrator in *Walker*, defendant did not run away when Bolt resisted.

We conclude that the evidence presented by the State is sufficient evidence from which a jury could infer defendant's intent to engage in vaginal intercourse with the victim against her will. Accordingly, the trial judge properly submitted the crime of felony murder predicated upon attempted rape to the jury. This assignment of error is overruled.

[6] Defendant next argues that the trial court erred by overruling his objection to evidence regarding a threat he made to a female detention officer employed by the Office of the Sheriff, Wake County, while in a holding cell. Defendant contends that the threat is not relevant, that its admission was unfairly prejudicial, and that the threat represents impermissible character evidence as defined by North Carolina Rule of Evidence 404(b). Defendant states that the trial court's admission of the threat violated both his constitutional and statutory rights. We disagree.

On 22 June 2000, the afternoon following his arrest, defendant was taken to the Wake County Courthouse for his first appearance. After the hearing, defendant was placed in a holding cell adjacent to the courtroom. Detention Officer Sandra McCormick supervised the cell. The State called Officer McCormick to testify at trial about defendant's behavior on that afternoon. Officer McCormick was questioned about her interaction with defendant and testified as follows:

[The State]: Officer McCormick, June 22nd of last year, please describe any other action [sic] you had with the Defendant in the holding cell in the jail, please.

[Witness]: Well, I was standing up at the podium, next to the courtroom door where the guys were going in and out, but Garcia was across over from me. He was really loud, boisterous. I tried to get him to calm down, because I know when people in there, how somebody talking the way he was, they would contact the D.A.'s office. I was doing it for his behalf, and that's when he made the statement to me.

[The State]:  Okay. Let's start with what he was saying. What was he saying out loud to everybody?

[Defense Counsel]:  Objection.

The Court:  Overruled.

[The State]:  You may answer. What was he saying out loud?

[Witness]:  After I told him, tried to get him to be—to be quiet, he made the statement, *I've already killed one. I got one up under my belt. And he was telling me about how he got so many black belts, you know, he didn't have anything to lose, I'll kill you . . . .*

(Emphasis added).

Prior to this line of questioning and out of the presence of the jury, defendant had objected to the portion of Officer McCormick's testimony recounting defendant's threat on her life. Defendant argued, through counsel, that the words "so many black belts" and "I'll kill you" were not relevant. At that time, however, defense counsel conceded that the accompanying phrases "I've already killed one" and "I got one up under my belt" were relevant as possible admissions of guilt. Specifically, defense counsel stated:

Your Honor, what I anticipate we are about to hear is a statement that Mr. Garcia is alleged to have made in the holding cell in his first appearance, something to the effect I got one under my belt, I've already killed someone, I've got nothing to lose. Which, obviously, goes directly to this incident. The portion of the statement that we object to is, at least according to the report, he went on to say that he would kill her, referring to Ms. McCormick, and something to the effect of I've got six years of black belt and I'll kill you.

The transcript further reveals that defendant objected solely on the grounds that the noted portions of Officer McCormick's testimony were not relevant. However, defendant failed to enter an objection based on constitutional grounds or based on North Carolina Rule of Evidence 404(b).

We recognize at the outset that defendant failed to raise a constitutional objection to this statement at trial and that "[c]onstitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *Watts*, 357 N.C. at 372, 584 S.E.2d at 745.

Furthermore, defendant did not raise a Rule 404 objection to the evidence. Likewise, in the absence of a specific objection based on Rule 404, defendant has failed to preserve this matter for review. N.C. R. App. P. 10(b)(1) ("In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context."); *see State v. Thibodeaux*, 352 N.C. 570, 577, 532 S.E.2d 797, 803 (2000) (declining to review an evidentiary assignment of error when defendant failed to enter a specific objection premised on the evidentiary rule purported to be violated), *cert. denied*, 531 U.S. 1155, 148 L. Ed. 2d 976 (2001). Therefore, we will address only the issue of relevance which defendant properly raised at trial.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2003). "All relevant evidence is admissible. . . ." *Id.*, Rule 402 (2003). In the context of a murder, "evidence is relevant if it 'tend[s] to shed light upon the circumstances surrounding the killing,' " *State v. Richmond*, 347 N.C. 412, 428, 495 S.E.2d 677, 685 (quoting *State v. Stager*, 329 N.C. 278, 322, 406 S.E.2d, 876, 901 (1991)) (alteration in original), *cert. denied*, 525 U.S. 843, 142 L. Ed. 2d 88 (1998), or "if it has any logical tendency, however slight, to prove a fact in issue," *Smith*, 357 N.C. at 613, 588 S.E.2d at 460.

Defendant concedes that the phrases "I've already killed one" and "I got one up under my belt" could be interpreted as statements of guilt. We hold that defendant's subsequent statements "so many black belts" and "I'll kill you" are relevant in the context of direct examination to show that what was "up under [defendant's] belt" was a human life, that the defendant had already "killed one" woman like Officer McCormick, and that by "belt," defendant meant black belt. Because these statements tend to prove that defendant acknowledged guilt in the death of Bolt, they are relevant.

Pursuant to Rules of Evidence 402 and 403, relevant evidence is generally admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (2003). The decision whether to exclude

relevant evidence under Rule 403 lies within the sound discretion of the trial court, *Braxton,* 352 N.C. at 186, 531 S.E.2d at 444, and " 'its ruling may be reversed for abuse of discretion only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision,' " *Richmond,* 347 N.C. at 429, 495 S.E.2d at 686 (quoting *State v. Collins,* 345 N.C. 170, 174, 478 S.E.2d 191, 194 (1996)). We find no such arbitrary action in this case. Accordingly, defendant's threat was admissible at trial. This assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[7] Defendant next argues that the trial court erred by excluding evidence of remorse during his sentencing proceeding. Specifically, defendant argues that his mother would have testified that he expressed remorse in conversations with her following the killing; however, the trial court improperly sustained several objections to that testimony. Although remorse was submitted to the jury as a nonstatutory mitigating factor, no juror found remorse to exist and to have mitigating value. Defendant contends that the exclusion of this evidence violated his constitutional rights to present mitigating evidence, to a fair sentencing hearing, and to be free from cruel and unusual punishment. We disagree.

Defendant called his mother, Libertad Rodriguez, as a witness during the sentencing phase of his capital trial. Rodriguez testified extensively about her own drug use while pregnant with defendant and throughout defendant's childhood and about defendant's addiction to narcotics at an early age. Rodriguez also offered testimony regarding defendant's broken home life, the severely impoverished and violent neighborhood in which she and defendant lived, her inability to provide safe child care for defendant, the death of defendant's grandparents, and defendant's successful completion of a drug treatment program. Near the end of Rodriguez's testimony, the State objected to five questions concerning defendant's discussions with Rodriguez after the murder. The trial court sustained three of those objections. It is apparent from the context of defense counsel's questions, including questions posed to Rodriguez during her prior testimony, that she had intended to testify to her son's remorse for the murder of Bolt.

[Defense Counsel]: After [defendant] was arrested for killing Juliann Bolt, did you have telephone conversations with him?

**STATE v. GARCIA**

[358 N.C. 382 (2004)]

[Rodriguez]: Yes, we talked—we talked a lot. We talked a lot. He didn't want to talk about the crime. And we never have talked about the crime. I knew very little about the crime until I got—I came here, but I knew, you know, what's happened. Basically, just the basic and—but he, he did, you know, the things that he could tell me was, you know, he—I feel very sad because he would tell me, you know, like momma, I feel so bad about what happened, but I don't want to—

[The State]: Objection, Your Honor.

[Rodriguez]: —talk about it.

The Court: Sustained.

. . .

[Defense Counsel]: Did you and [defendant], he discuss his feelings about what had happened?

[Rodriguez]: Yes, we—he did.

[Defense Counsel]: And what was that discussion about?

[Rodriguez]: He—

[The State]: Object to this, Your Honor.

The Court: Overruled.

[Rodriguez]: We talked, and, you know—

[The State]: I object to this, Your Honor.

The Court: Overruled.

[Rodriguez]: Sometimes on the phone, he would be sounding depressed. And, you know, my thing to him was always, like I love you. You know, I know this is, you know, bad, but, you know, we love you, we're behind you. And I would talk a lot about the [L]ord to him, and tell him, you know, just ask the [L]ord, why do you—you don't—once you make peace with the [L]ord, then you're okay, you know. And he expressed to me that he did. And he even would say momma, read this first, because that will help you, because that helped me. And read this other verse, like that. And it helped me to know that he was, you know, sometimes he would be really depressed and say, I wish I was back working, mom, I wish this never had happened, but it was tough—

[Defense Counsel]: In those phone calls, when you're talking about [defendant], about his feelings, about what had happened, did he ever express any remorse or sympathy about the case?

[Rodriguez]: Yes.

[The State]: Objection.

The Court: Sustained.

[Defense Counsel]: Other than what you've told us about making peace with the [L]ord, what other feelings were expressed to you about—

[Rodriguez]: About the case? We didn't go into any specifics or anything.

[Defense Counsel]: I'm talking about feelings, not the details of the case.

[Rodriguez]: About feelings, he always told me he was sorry because he apologize—

[The State]: Object.

The Court: Sustained.

[Defense Counsel]: Nothing further.

Defendant argues that the trial court rulings sustaining the State's objections were improper because they prevented him from offering evidence of remorse to mitigate his sentence. We agree that the trial court erred; however, we find that defendant did not preserve this error at trial and, in the alternative, that the error is harmless beyond a reasonable doubt.

Traditional rules of evidence do not apply to capital sentencing hearings. During those proceedings, all relevant mitigating evidence must be admitted, even when state evidentiary rules dictate its exclusion. *See Green v. Georgia*, 442 U.S. 95, 97, 60 L. Ed. 2d 738, 741 (1979) (per curiam). Our courts employ this relaxed standard because in capital cases " 'the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " *Eddings v. Oklahoma*, 455 U.S. 104, 112, 71 L. Ed. 2d 1, 9 (1982) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961

(1976)) (alteration in original); *Lockett, v. Ohio*, 438 U.S. 586, 601, 57 L. Ed. 2d 973, 988 (1978) (same). Defendant's proffered testimony, which tended to prove that he felt regret for the crime he committed, should have been admitted as relevant mitigating evidence in the sentencing phase of his capital trial. Accordingly, we determine that the trial court committed constitutional error by excluding these portions of Rodriguez's testimony.

However, defendant did not raise this constitutional issue at trial. As a result, the trial court was denied the opportunity to consider and correct the error. Because it is well settled that constitutional matters that are not raised and passed upon at trial will not be reviewed for the first time on appeal, defendant has failed to preserve this assignment of error for our review. *Watts*, 357 N.C. at 372, 584 S.E.2d at 745.

Even so, we believe the trial court's rulings were harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2003) (providing that constitutional error "is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt"). The erroneous exclusion of evidence is not prejudicial when "the same or substantially the same testimony is subsequently admitted into evidence." *State v. Burke*, 342 N.C. 113, 120, 463 S.E.2d 212,·217 (1995) (quoting *State v. Hageman*, 307 N.C. 1, 24, 296 S.E.2d 433, 446 (1982)); *accord State v. Walden*, 311 N.C. 667, 673-74, 319 S.E.2d 577, 581 (1984). Moreover, the State has shown beyond a reasonable doubt that under the specific facts of this case, the exclusion was harmless and did not affect the outcome of the trial.

Notwithstanding the trial court's error, other evidence of defendant's remorse, not specifically objected to by the State, was before the jury. Rodriguez testified that defendant felt "very sad" and felt "so bad about what happened." She also testified that defendant told her he had made "peace with the [L]ord" and that he "wish[ed] this never had happened." When asked directly whether defendant talked about feelings of remorse, Rodriguez answered "yes." Finally, Rodriguez stated that defendant "always told [her] he was sorry because he would apologize." Although the State's objections effectively interrupted the flow of Ms. Rodriguez's testimony, and eventually halted defense counsel's line of questioning, the State made no motion to strike Ms. Rodriguez's prior admitted evidence of defendant's remorse.

Also, Charles Rabb, a man involved in prison ministries, testified that defendant told him that he had murdered Bolt and that defend-

ant was taking his sins to Christ. From this testimony and the admitted testimony of defendant's mother, the jury could have determined that defendant felt meaningful personal regret for his wrongdoing.

In summary, we determine that defendant failed to preserve this assignment of constitutional error for review. In the alternative, if defendant had preserved an assignment of constitutional error, then any error resulting from the exclusion of this evidence would be deemed harmless beyond a reasonable doubt. This assignment of error is overruled.

[8] Next, defendant argues that the trial court erred by failing to intervene *ex mero motu* during closing arguments at the capital sentencing proceeding. Specifically, defendant argues that throughout closing arguments, both prosecutors made comments suggesting they knew about other murders that were less egregious than the killing committed by defendant and that those comments represented the improper personal opinions and extra-record knowledge of the prosecutors.

In particular, defendant cites the following statement:

Members of the jury, I hope I am successful in refocusing this jury and reminding this jury what really is relevant and what is important in this case. [The] [q]uestion I have for you is what is the price for causing such misery, for causing such pain? *As the final issue this jury will have to determine, you have to ask yourself is this an ordinary case of homicide, or is there something exceptionally disturbing about this first degree murder?*

(Emphasis added). Also, defendant takes exception to the prosecutors' description of Bolt's murder as "Society's worst fear realized" and "Society's worst fear," as well as their statement that "[i]t doesn't get any worse than what you've seen in this case." Defendant contends that these arguments represent personal opinions and extra-record knowledge that the State used to advance the theme that Bolt's murder was an extraordinary murder in order to persuade the jury to find one aggravating circumstance—an especially heinous, atrocious, or cruel murder—and to convince the jury that the aggravator warranted a sentence of death. We recognize at the outset that " 'statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal,' " *Jaynes*, 353 N.C. at 559, 549 S.E.2d at 198 (quoting *State v. Green*, 336 N.C. 142,

188, 443 S.E.2d 14, 41, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)), and that because defendant failed to object to these allegedly improper statements during closing arguments, he "must demonstrate that the prosecutor's closing arguments amounted to gross impropriety," *State v. Rouse,* 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *cert. denied,* 516 U.S. 832, 133 L. Ed. 2d 60 (1995).

The same standard of gross impropriety governs closing arguments during both phases of a capital trial. Defendant's arguments are correct in that "[d]uring a closing argument to the jury an attorney may not . . . inject his personal experiences . . . or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." N.C.G.S. § 15A-1230(a) (2003). However, an attorney may "on the basis of his analysis of the evidence, argue any position or conclusion with respect to a *matter in issue." Id.* (emphasis added). Additionally, because "the objectives of the arguments in the two phases are different . . . rhetoric that may be prejudicially improper in the guilt phase is acceptable in the sentencing phase." *State v. Kandies,* 342 N.C. 419, 452, 467 S.E.2d 67, 85, *cert. denied,* 519 U.S. 894, 136 L. Ed. 2d 167 (1996).

During the capital sentencing phase of a trial, matters in issue for the jury's consideration generally include those circumstances surrounding a murder which tend to aggravate or mitigate a defendant's criminal culpability. Accordingly, a prosecutor may properly argue the existence of aggravating circumstances, as well as the relative weight the jury should lend to each circumstance. *Cf. State v. Craig,* 308 N.C. 446, 460, 302 S.E.2d 740, 749 ("[C]ounsel is entitled to argue what weight [mitigating] circumstances should ultimately be assigned."), *cert. denied,* 464 U.S. 908, 78 L. Ed. 2d 247 (1983). N.C.G.S. § 15A-2000(e) lists the eleven "[a]ggravating circumstances which may be considered" by a capital jury, including that "[t]he capital felony was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (2003). This Court has previously determined that N.C.G.S. § 15A-2000(e)(9) refers to the level of brutality incident to the murder, and that to meet this aggravator, prosecutors must show that the brutality involved exceeded that which is normally present in any killing. *State v. Goodman,* 298 N.C. 1, 24-25, 257 S.E.2d 569, 585 (1979).

We determine that prosecutors properly drew reasonable inferences about the degree of brutality accompanying Bolt's murder, explained those inferences to the jury, and argued that the jury

should conclude that the killing committed by defendant was "especially heinous, atrocious, or cruel." *See Jaynes*, 353 N.C. at 560-61, 549 S.E.2d at 199 (" 'A prosecutor in a capital trial is entitled to argue all the facts submitted into evidence as well as any reasonable inferences therefrom.' ") (quoting *State v. Gregory*, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996)). Prosecutors did not urge their personal beliefs to the jury, but instead reminded jurors that they must make an independent decision. The questions "is this an ordinary case of homicide, or is there something exceptionally disturbing about this first degree murder?" and "what is the price for causing such misery, for causing such pain?" focused the jurors' attention on the decision they were required to make as to whether the section 15A-2000 e(9) "especially heinous, atrocious, or cruel" aggravator existed and if so as to what weight its existence should be given. Prosecutors did not venture outside the record to inject facts of their own knowledge, but instead properly limited their argument to conclusions derived from facts in evidence. Prosecutors argued that the jury should place great weight on the e(9) aggravator by recounting the circumstances surrounding Ms. Bolt's death and concluding that those circumstances constituted "[s]ociety's worst fear."

We determine that, when viewed in context, the statements of prosecutors during defendant's sentencing proceeding represented permissible argument regarding a matter in issue, the existence or nonexistence of statutory aggravator N.C.G.S. § 15A-2000(e)(9). For these reasons, we decline to find any gross impropriety which would necessitate *sua sponte* action on the part of the trial court. This assignment of error is overruled.

## PRESERVATION ISSUES

Initially, we address two assignments of error which have not been characterized as preservation issues by defendant, but which our review indicates are most appropriately examined under this heading. First, defendant argues that the State's failure to allege aggravating circumstances in the short-form murder indictment is a jurisdictional defect and that prosecution under such an insufficient charging document violates his federal and state constitutional rights. We have recently considered and rejected this argument in *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593. In *Hunt*, this Court held that short-form indictments satisfy state and federal constitutional requirements. *Id.* Accordingly, the trial court had jurisdiction to try defendant; the short-form indictment did not violate defendant's con-

STATE v. GARCIA

[358 N.C. 382 (2004)]

stitutional rights, and his prosecution was proper. This assignment of error is overruled.

Second, defendant argues that he is entitled to a new capital sentencing hearing because the statutory aggravating circumstance submitted to the jury—that the murders were especially heinous, atrocious, or cruel—is unconstitutionally vague. We have consistently rejected this argument, *see, e.g., State v. Miller*, 357 N.C. 583, 601, 588 S.E.2d 857, 869 (2003); *State v. Haselden*, 357 N.C. 1, 26, 577 S.E.2d 594, 610, *cert. denied*, —— U.S. ——, 157 L. Ed. 2d 382 (2003); *State v. Call*, 353 N.C. 400, 424, 545 S.E.2d 190, 205, *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001), and decline to re-examine our prior holdings. This assignment of error is overruled.

Defendant raises nine additional issues, each of which this Court has consistently decided contrary to defendant's position. Defendant claims the trial court erred by: (1) allowing the State to try defendant for first-degree murder when the short-form indictment failed to allege all the elements of that offense; (2) instructing the jurors that they must act unanimously when answering any of the following questions: (i) did the aggravating circumstance submitted to them exist?; (ii) are any mitigating circumstances found insufficient to outweigh the aggravating circumstance?; and (iii) was the aggravating circumstance sufficiently substantial to support the death penalty when considered with any mitigating circumstances?; (3) instructing the jury that it had a duty to return a sentence of death if it made certain findings; (4) instructing the jury that defendant's burden of proof applicable to mitigating circumstances was to the jury's "satisfaction"; (5) instructing the jury not to consider nonstatutory mitigating circumstances unless the jury deemed the circumstances to have "mitigating value"; (6) giving an unconstitutionally broad instruction defining "aggravation"; (7) instructing jurors that they "may" consider mitigating circumstances when determining (i) whether mitigating circumstances were insufficient to outweigh aggravating circumstances and (ii) whether aggravating circumstances were sufficiently substantial to call for the death penalty; and (8) instructing the jury that each juror may only consider mitigating evidence which that particular juror had found to exist when determining (i) whether mitigating evidence was insufficient to outweigh aggravating evidence and (ii) whether the aggravating evidence was sufficiently substantial to warrant imposition of the death penalty. Defendant also argues that the North Carolina death penalty statute is unconstitutionally vague and overbroad and is unconstitutionally applied in an arbitrary

and discriminatory manner and that the death penalty is inherently cruel and unusual.

Defendant raises these issues for the purpose of requesting this Court to reconsider its prior decisions and for the purpose of preserving them for further appellate review of his case. We have considered defendant's arguments on these issues and decline to depart from our existing holdings. These assignments of error are overruled.

## PROPORTIONALITY

[9] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now determine: (1) whether the record supports the aggravating circumstance found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (2003).

As to the first two of these tasks, "[w]here there is evidence to support the aggravating factors relied upon by the State . . . the jury's balancing of aggravation and mitigation will not be disturbed unless it appears that the jury acted out of passion or prejudice or made its sentence arbitrarily." *State v. Zuniga*, 320 N.C. 233, 273, 357 S.E.2d 898, 923, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). In the instant case, defendant was convicted of first-degree murder. His conviction was based upon the felony murder rule with the underlying felony being attempted rape. Following defendant's capital sentencing proceeding, the prosecution submitted one aggravating circumstance for the jury's consideration: "Was this murder especially heinous, atrocious, or cruel?" The jury found that aggravating circumstance to exist.

The jury also found two statutory mitigating circumstances: (1) defendant has no significant history of prior criminal acts, and (2) the capital felony was committed while defendant was under the influence of mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(1),(2) (2003). Two additional statutory mitigating circumstances were submitted to, but not found by, the jury. Those circumstances were: (1) "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the

requirements of [the] law was impaired," and (2) the catchall statutory mitigating circumstance, which is "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value." *Id.* § 15A-2000(f)(6),(9) (2003). Of the twenty-four nonstatutory mitigating circumstances submitted, one or more jurors found that eight existed and had mitigating value.

After thoroughly reviewing the record, transcripts, and briefs in this case, we conclude that the evidence fully supports the aggravating circumstance found by the jury. Further, we conclude that nothing in the record suggests defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Accordingly, we will not disturb the jury's balancing of aggravating and mitigating circumstances on appeal.

Turning now to our final statutory duty, we recognize that proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *Smith,* 357 N.C. at 621, 588 S.E.2d at 464. In conducting the proportionality review, we must determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). This determination " 'ultimately rest[s] upon the "experienced judgments" of the members of this Court.' " *Smith,* 357 N.C. at 622, 588 S.E.2d at 465 (quoting *Green,* 336 N.C. at 198, 443 S.E.2d at 47) (alteration in original).

This Court has previously determined that the death penalty was disproportionate in eight cases. *State v. Kemmerlin,* 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *Young,* 312 N.C. 669, 325 S.E.2d 181; *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). In only two of these cases, *Stokes* and *Bondurant,* did the jury find the murder to be especially heinous, atrocious, or cruel. Both *Stokes* and *Bondurant* are easily distinguished from the case at bar.

In *Stokes,* the seventeen-year-old defendant was the only one of four assailants to receive the death penalty. 319 N.C. at 3-4, 11, 352

S.E.2d at 654-64, 668. In *Bondurant,* the defendant not only indicated remorse immediately after shooting the victim, but he also took the victim to the hospital for treatment. 309 N.C. at 694, 309 S.E.2d at 182-83. Unlike the defendant in *Stokes,* defendant in the present case murdered Bolt by himself, and he was thirty-one years old at the time. Furthermore, defendant took no such apologetic or ameliorative actions as were present in *Bondurant.*

Among other circumstances, this Court considers the brutality of a killing during proportionality review. *State v. Reeves,* 337 N.C. 700, 740, 448 S.E.2d 802, 822 (1994) ("In determining proportionality, we are impressed with the cold-blooded, callous and brutal nature of this murder."), *cert. denied,* 514 U.S. 1114, 131 L. Ed. 2d 860 (1995); *State v. Moseley,* 336 N.C. 710, 725, 445 S.E.2d 906, 915 (1994) ("In determining proportionality, we are impressed with the brutality and 'overkill' evidenced in this murder."), *cert. denied,* 513 U.S. 1120, 130 L. Ed. 2d 802 (1995). We have also determined that murders committed during the perpetration of a sexual assault may be more deserving of the death penalty. *See State v. Payne,* 337 N.C. 505, 537, 448 S.E.2d 93, 112 (1994) (listing the brutality of the attack and rape of the victim as distinguishing characteristics of the defendant's crime during proportionality review), *cert. denied,* 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Here, defendant committed the murder during his attempt to rape Bolt, and evidence presented during both the guilt-innocence and sentencing phases of trial tended to show that his attack on her was dehumanizing. Defendant forced Bolt to strip from the waist down. He then began striking her, forced her to the bathroom floor, and continued to beat her with a revolver. At some point, defendant pushed up Bolt's shirt. Once Bolt was forced to the floor, forensic evidence, including a lack of blood on the soles of her shoes, indicated that she was unable to stand again. However, evidence present at trial does show that Bolt tried to fight back and to get away from defendant. The State's witness, Dr. Dennis Ose, who performed an autopsy on Bolt, testified that Bolt had sustained multiple defensive wounds to her hands and arms, including a broken fingernail on her right hand.

Additionally, evidence presented by the State suggested that Bolt was conscious during much of the attack. State Bureau of Investigation Special Agent Duane Deaver, a blood spatter expert, testified that he observed blood smear stains on multiple areas of the restroom floor and that one explanation for the stains is that Bolt was crawling in her own blood. Dr. Ose testified that he removed 200 ccs

of blood from Bolt's stomach during the autopsy and that, in his opinion, Bolt was alive when she swallowed that blood.

Further, there is evidence that the attack took place over a period of time. Agent Deaver testified that Bolt's blood was smeared, pooled, and spattered in multiple locations within the restroom. From his observations, Deaver determined that the attack began in a toilet stall, but continued as Bolt lay or crawled on the floor. Two separate and significant pools of blood on the floor indicated that Bolt lay bleeding in one area for some period of time before moving, or being moved, to the second area. Additionally, Deaver testified that, in his opinion, bleeding wounds like the ones sustained by Bolt do not result from a single blow. According to Deaver, multiple impacts to the same part of a person's body are generally required to inflict openly bleeding injuries.

Finally, the nature and extent of the blows inflicted upon Bolt were mutilating. Crime scene investigator Leyla Iz testified that she was unable to identify Bolt's body by comparing it to her photograph. Bolt sustained multiple skull fractures including an open skull fracture. Responding police officers discovered brain matter on the restroom floor. Dr. Ose testified that Bolt's right frontal lobe was missing from her skull and that sixty-five grams of brain matter arrived for autopsy separate from her body. When questioned about the amount of force required to open a human skull, Dr. Ose testified that pathologists usually use an electric saw to open a skull during autopsies. A large portion of Bolt's body was covered in blood such that her body needed to be cleaned for autopsy photographs. Blood had even saturated Bolt's socks. Dr. Ose testified that Bolt lost approximately two units of blood from her head injuries and that a human body generally contains a total of four to five units of blood. Finally, Dr. Ose testified that Bolt had also sustained bruising or lacerations to her face, neck, back, shoulders, knees, arms, and right hand.

In the instant case, defendant murdered Bolt during the perpetration of an attempted rape; Bolt was murdered in a dehumanizing manner; Bolt was conscious during part of the attack; Bolt knew she was in life-threatening danger; Bolt tried to defend herself; blood spatter evidence indicates defendant beat Bolt for a significant period of time, and defendant used a gross amount of force resulting in Bolt's mutilation. From this and other relevant evidence, we conclude that the crime committed by defendant in this case was equally as brutal as other murders for which a death sentence has been

imposed. Although we "compare this case with the cases in which we have found the death penalty to be proportionate . . . . we will not undertake to discuss or cite all of those cases each time we carry out that duty." *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). Our determination that the sentence of death is not disproportionate is sufficient. We hold, therefore, that the sentence is neither excessive nor disproportionate given the nature of both the defendant and the crime he committed.

As a collateral matter, we note that defendant argues that this Court's standards for proportionality review are vague and arbitrary, depriving defendant of his constitutional rights to notice, effective assistance of counsel, due process, and freedom from cruel and unusual punishment. We considered and rejected this argument in *Simpson*, 341 N.C. at 358-59, 462 S.E.2d at 215-16, and we see no reason to depart from our prior holding.

Based on the foregoing and the entire record in this case, we hold that defendant received a fair trial and capital sentencing proceeding, free of reversible error. Accordingly, the judgment of the trial court must be and is left undisturbed.

NO ERROR.

Justice EDMUNDS concurring.

Although I agree with the premise of the dissent that North Carolina's procedures and case law relating to a bill of particulars contain more promise than substance, I do not believe that the trial court abused its discretion here. Defendant's motion for a bill of particulars made three requests. First, he asked for the date and time of the victim's death. There is no indication that defendant did not receive this information. Second, defendant asked for "[t]he basis for prosecution of the Defendant for first degree murder, that is, whether the State relies on the felony murder rule, on the existence of premeditation, deliberation, and intent to kill, or on some other theory in seeking conviction of the Defendant for first degree murder." The record indicates that defendant at trial was aware that the prosecution was proceeding under the theories both of felony murder and of premeditation and deliberation. Finally, defendant asked that the prosecution set out "[t]he aggravating circumstances the State contends are present in this case in order to justify the death penalty."

Under the facts here, the only aggravating circumstance that might implicate felony murder is set out in N.C.G.S. § 15A-2000(e)(5). This circumstance arises where "[t]he capital felony was committed while the defendant was engaged . . . in the commission of . . . any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb." N.C.G.S. § 15A-2000(e)(5) (2003). While the felony underlying a felony murder conviction can also serve as an aggravating circumstance where a defendant is convicted of first-degree murder both on the basis of felony murder and of premeditation and deliberation, *see, for example, State v. Robinson*, 355 N.C. 320, 341, 561 S.E.2d 245, 258, *cert. denied*, 537 U.S. 1006, 154 L. Ed. 2d 404 (2002), defendant here did not request that the prosecution commit itself to establishing any of the offenses listed in this circumstance. Instead he only asked, in effect, whether the prosecution would seek to submit this aggravating circumstance to the jury at sentencing.

Thus, defendant did not request that the prosecution state which underlying felony or felonies it would attempt to prove to establish felony murder. In addition, even if he had, the controlling statute states that "[a] motion for a bill of particulars must request and specify items of factual information." N.C.G.S. § 15A-925(b) (2003). Defendant's motion did not request specific factual information on which the prosecution would rely to support any underlying felony that the prosecution might seek to establish as a basis for felony murder. Because defendant's motion for a bill of particulars did not meet the statutory requirements, I do not believe that the trial judge's denial of the motion was a " 'palpable and gross abuse' " of discretion. *State v. Easterling*, 300 N.C. 594, 601, 268 S.E.2d 800, 805 (1980) (quoting *State v. McLaughlin*, 286 N.C. 597, 603, 213 S.E.2d 238, 242 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976)).

Justice ORR dissenting.

I write separately to express my concerns on the issue of whether defendant was deprived of adequate notice for the underlying felony alleged in this felony murder case. Defendant framed this issue in two parts: first, that the trial court erred in denying defendant's motion to quash the indictment for failure to allege the particular felony upon which the charge of felony murder was based; and second, that defendant's request for a bill of particulars should have been allowed.

**STATE v. GARCIA**

[358 N.C. 382 (2004)]

The majority concludes that the indictment was proper and that the denial of defendant's request for a bill of particulars was not error. I disagree.

From the outset, I note that this issue is distinct and separate from the issue of whether the short-form indictment is an adequate instrument for charging an accused with homicide. I recognize, and concur with, the long-held view of this Court that the short-form indictment remains a viable homicide-charging instrument, and I raise no arguments here against its continuing vitality. My concerns, rather, are focused on the specific problems endemic to charging an accused with felony murder, a unique offense complicated by the fact that it requires proof of one crime in order to establish proof of another.

The verdict sheet in this case reveals that defendant was convicted of first-degree murder, and though the jury had the option of premising its verdict on the basis of premeditation and deliberation, it declined to do so. Instead, its verdict was based on the fact that the killing was committed "in the perpetration of a felony," and that the felony committed was "attempted rape." Thus, this case proceeded to this Court on appeal from the jury's verdict finding defendant guilty of what is commonly referred to as felony murder and the imposition of a death sentence.

When a defendant faces a murder charge premised on a killing that occurs during the commission of a violent felony, *see* N.C.G.S. § 14-17 (2003), the prosecution must prove at trial two things: (1) that defendant's participation in the underlying crime satisfies the statutory or common law elements of the offense, and (2) that the victim died during the commission of, or as a consequence of, the underlying crime.

Of course, self-evident circumstances tend to demonstrate the second requirement; there would be no capital murder charge to begin with if someone had not died during the commission of, or as a consequence of, the violent felony at issue. For example, the facts of this case amply show that the victim died a tragically violent death in the weight room of her apartment complex. The relevant question at trial, therefore, was whether defendant's actions led to her death and, if so, did such actions constitute the commission of a violent crime that qualifies as an underlying felony for purposes of felony murder. In essence, prosecutions in felony murder cases boil down to proving that defendant committed the underlying crime. The practical effect

of such proof—as found by a jury by the standard of beyond a reasonable doubt—translates into the following: defendant committed the underlying crime and a death ensued; therefore, defendant committed felony murder. Put another way, the outcome of a felony murder trial, when stripped to its core, hinges on whether or not defendant committed the underlying offense. If the jury determines he did not (commit the underlying crime), it simultaneously exonerates him of the felony murder charge.

In my view, if a defendant's conviction for felony murder hinges on proving whether or not he committed the underlying offense, then constitutional notice requirements demand that he be afforded notice of the crime he must defend against. *See Hodgson v. Vermont*, 168 U.S. 262, 269, 42 L. Ed. 461, 463 (1897) (holding that "in all criminal prosecutions the accused must be informed of the nature and cause of the accusation against him; that in no case can there be, in criminal proceedings, due process of law where the accused is not thus informed, and that the information which he is to receive is that which will acquaint him with the essential particulars of the offence, so that he may appear in court prepared to meet every feature of the accusation against him"); *see also* N.C. Const. Art. I, § 23 ("In all criminal prosecutions, every person charged with crime has the right to be informed of the accusation . . . ."); N.C.G.S. § 15A-924(a)(5) (2003) (criminal pleadings must contain a "plain and concise factual statement . . . with sufficient precision clearly to apprise the defendant or defendants of the conduct which is the subject of the accusation"). Thus, if the State pursues a felony murder charge against a defendant, it would appear that the State is obligated to somehow inform the defendant of the specific underlying felony it aims to prove at trial. The practical implications of this specific information go to the heart of a defendant's ability to prepare for trial and to defend himself through examination of witnesses, the production of evidence, and argument to the jury.

The majority first concludes that the indictment at issue was sufficient, relying on our prior holdings dealing with short-form indictments. The majority then explains that case law has also established that the State need not choose between "theories" of its case prior to trial. In its view, defendant was properly denied his request for the State to identify the crime he would defend against at trial because the State is not required to reveal its "theory" of the case before trial. Thus, according to the majority, the State's "theory" translates into the identity of the actual crime alleged. In my view,

the State's "theory" of a case—the whats, hows, and whys of a criminal offense—is not synonymous with identifying the particular offense alleged. The two are separate and distinct entities. If, as the majority asserts, the State's "theory" of the case is indeed commensurate with identifying the specific crime at issue, and the State is not required to reveal its "theory" pre-trial, how could an indictment requirement exist for any crime?

This Court has yet to address directly the issue of what constitutes adequate notice of the underlying felony charge as it relates to a felony murder prosecution. One obvious solution would be to require the State to secure a separate indictment for the underlying offense. However, a review of felony murder cases over the past thirty years reveals that few such prosecutions have included such separate indictments. Although this Court at one point suggested, without elaboration, that separate indictments were unnecessary, see State v. Carey, 288 N.C. 254, 274, 218 S.E.2d 387, 400 (1975) ("[i]t seems to us that the better practice . . . would be that the solicitor should not secure a separate indictment for the felony"), death sentence vacated, 428 U.S. 904, 49 L. Ed. 2d 1209 (1976), I note that it did so amid dicta surrounding the issue of arresting judgments, id. The Court in Carey did not address the separate indictment issue in the context of providing notice to the defendant of the charges against him, nor did it include any explanation as to why it felt a single indictment—for felony murder—was "the better practice."

I note that the Court in Carey, when considering the issue of separate indictments, may not have concerned itself with notice requirements since existing law at the time had affirmatively declared that a felony-murder defendant who desires more definite information concerning the underlying crime "ha[s] the right to request a bill of particulars." State v. Crawford, 260 N.C. 548, 556, 133 S.E.2d 232, 238 (1963) (quoting State v. Mays, 225 N.C. 486, 489, 35 S.E.2d 494, 496 (1945)). However, the problem then, as now, is that when a felony-murder defendant moves for a bill of particulars concerning the alleged underlying crime, his motion is subject to the discretion of the trial judge, see State v. Covington, 290 N.C. 313, 343, 226 S.E.2d 629, 649 (1976), and is not subject to review except for palpable and gross abuse of discretion, State v. Swift, 290 N.C. 383, 391, 226 S.E.2d 652, 660 (1976); see also State v. Williams, 355 N.C. 501, 542, 565 S.E.2d 609, 633 (holding that a " 'denial of a defendant's motion for a bill of particulars will be held error only when it clearly appears to the appellate court that the lack of timely access to the requested

information significantly impaired defendant's preparation and conduct of his case' "), (quoting *State v. Easterling*, 300 N.C. 594, 601, 268 S.E.2d 800, 805 (1980)), *cert. denied, Williams v. North Carolina*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). Therefore, a felony-murder defendant's "right" is limited to *requesting* more definite information, not to receive it. A review of case law in the wake of *Crawford* yields no case in which a felony-murder defendant successfully petitioned the trial court for a bill of particulars that would identify the underlying felony he was accused of committing. As a consequence, any such "right" to a bill of particulars reveals itself as a paper tiger, a toothless guarantee.

I note that the felony-murder defendant in *Crawford* did not move the trial court for a bill of particulars concerning the details or identity of the underlying crime, prompting the Court to advise him thusly: " 'If the defendant desired more definite information he had the right to request a bill of particulars, *in the absence of which he has no cause to complain.*' " 260 N.C. at 556, 133 S.E.2d at 238 (emphasis added) (quoting *Mays*, 225 N.C. at 489, 35 S.E.2d at 496). The implication of the holding, and any inference reasonably drawn therefrom, certainly suggest, if not establish, that had the defendant moved for a bill of particulars, he would have cause to complain. Yet in the instant case, where defendant did in fact petition for such a bill of particulars, the majority concludes he, too, is without cause to complain. If a defendant is deemed without complaint for failing to move for a bill of particulars, and he is deemed without complaint when he moves for a bill of particulars but does not receive the information he has requested, when precisely will a felony-murder defendant be positioned to complain (that he cannot mount a credible defense against a crime that may not even be identified until the trial's end)?

Matters pertaining to the scope and procedure of a bill of particulars are outlined in N.C.G.S. § 15A-925. The first three subsections are particularly relevant to the instant case and read as follows:

(a) Upon motion of a defendant . . ., the court in which a charge is pending may order the State to file a bill of particulars with the court and to serve a copy on defendant.

(b) A motion for a bill of particulars must request and specify items of factual information desired by the defendant which pertain to the charge and which are not recited in the pleading, and

must allege that the defendant cannot adequately prepare or conduct his defense without such information.

(c) If any or all of the items of information requested are necessary to enable the defendant adequately to prepare or conduct his defense, the court must order the State to file and serve a bill of particulars. Nothing contained in this section authorizes an order for a bill of particulars which requires the State to recite matters of evidence.

N.C.G.S. § 15A-925 (2003). A breakdown of the statute's key provisions is as follows: (1) defendant needs to specify the desired information pertaining to the charge that is not included in the pleading (indictment); (2) he needs to allege that he cannot prepare his defense without such information; and, when he does so, (3) the trial court *must* order the State to provide a bill of particulars if defendant shows they are necessary to prepare his defense. In the context of a felony murder charge, what could be more necessary to enable a defendant to prepare his defense than to be informed of the actual charge he must defend against? Again, I emphasize that a conviction for felony murder is tantamount to proving, beyond a reasonable doubt, that defendant committed the underlying felony.

In addition, I note that whether spelled out in an indictment or not, the underlying felony is treated as a distinct criminal offense. If a defendant is convicted of felony murder, he is also "convicted" of the underlying felony. In the instant case, an examination of the issue and judgment sheets reveals that defendant was convicted of two crimes—felony murder *and* the underlying felony of attempted rape. The case is far from unique; its verdict emulates those of all other felony murder prosecutions that resulted in convictions. Thus, despite the aforementioned notice protections accorded suspects in our state's Constitution and statutes, a criminal defendant can be, and frequently has been, convicted of an offense for which he has not been indicted, and that has not even been identified until his trial is over.

The particular circumstances of the instant case, in which defendant was on trial for his life, vividly demonstrate the logistical problems associated with notice in felony murder prosecutions. After being indicted by short form for felony murder, defendant filed a pretrial motion with the trial court for a bill of particulars concerning details of what the State intended to prove at trial. At a hearing addressing the motion, defendant requested that the State be com-

pelled to provide two pieces of information germane to the discussion at issue: (1) whether the State planned to proceed on the theory of first-degree murder premised on premeditation and deliberation or felony murder; and (2) if premised on felony murder, what would be the underlying felony the State intended to prove at trial.

After properly denying defendant's request for information concerning whether the State intended to choose between theories of premeditation and deliberation or felony murder, *see State v. Avery*, 315 N.C. 1, 13-14, 337 S.E.2d 786, 793 (1985) (holding that the state's Constitution does not require a murder indictment to specifically allege premeditation and deliberation or felony murder), the following discussion took place concerning defendant's request for specifying the underlying felony:

Ms. SPURLIN (Assistant District Attorney): Your Honor, I would say to the Court, the [S]tate intends to proceed not only on first-degree murder with premeditation and deliberation, but also first-degree murder under the felony murder rule, and we'll be asking the Court, *at the end of all the evidence*, to submit all of those felonies which the [S]tate has provided sufficient evidence to go as to the basis of the felony murder rule. And again[,] *that decision will be made at the end of all of the evidence.*

MR. GASKINS (Defense Counsel): [W]hile I recognize that the [S]tate contends that it is proceeding on the felony murder rule, the defendant contends, based on lots of factors, including the material revealed in discovery, that there are no controls and that if the [S]tate just would like to just kind of say, let's throw it all out there, see how it all comes out in the wash, I don't think we're permitted to do that . . . .

. . . I think if the [S]tate has evidence of felonies, of underlying felonies, then we're required to know specifically what those are.

. . . .

Ms. SPURLIN: Again, the defendant has all the discovery. We may have a difference of opinion as to whether or not this is a case that will go to the jury for felony murder. . . . I'm simply saying to the Court we believe the evidence will support those. We are not required to state those prior to trial.

I don't know that we're in a position to be able to state that to this Court. Again, the issue is what, *at the end of all of the evi-*

*dence,* has been supported by the evidence to be presented to the jury. It's not required and again I don't believe the [S]tate's in a position to be able to do that.

THE COURT: Well, what is ultimately going to go to the jury is going to be decided by me after I have heard all of the evidence.

(Emphasis added). In the aftermath of this discussion, the trial court informed defense counsel thusly: "Mr. Gaskins, unfortunately, from what I've heard since you made that motion, I don't know that they know what the underlying felony is going to be other than there are two possibilities—one, robbery, a theory no one believes in law enforcement or the girlfriend, and the other has to be sex. Other than that, I don't know of any theory." The trial court then proceeded to deny defendant's motion for a bill of particulars concerning the particular underlying felony defendant was alleged to have committed.

Thus, to that point, amid pre-trial proceedings, the trial court informed defendant that: (1) the State did not know which underlying felony it would attempt to prove; (2) the State was not required to allege before trial which underlying felony it would attempt to prove; and (3) defendant was not entitled to know which particular felony or felonies he would be defending against at trial.

Then, at the *close* of all the evidence presented at trial, the trial court weighed whether or not the State provided ample evidence to warrant a jury instruction for the following underlying felonies: (1) robbery, (2) kidnapping, and (3) attempted rape. The trial court dismissed the robbery allegation out of hand and then heard arguments regarding kidnapping and attempted rape. After deliberating through a lunch recess, the trial court returned and, without elaboration, announced it would instruct the jury on felony murder, with attempted rape being the underlying felony.

Thus, at some point after the close of all the evidence presented at trial, defendant was notified of the specific crime he was expected to defend against. Of course, at that juncture, the information was of no use; the evidentiary portion of the trial was over. Defendant, facing the prospect of a death sentence, had defended the entire evidentiary portion of his trial without the benefit of knowing the specific crime the State intended to submit for the jury's consideration. To make matters worse, the trial judge's pre-trial prediction as to what

the underlying crime may be—"robbery" or "sex"—provided little useful guidance and, in fact, proved partially erroneous. In addition to the two crimes suggested by the trial court during pre-trial proceedings, a third crime—"kidnapping"—emerged as a potential underlying felony at trial, and in fact was offered as such at the close of evidence by the State. As a consequence, defendant proceeded through trial attempting to defend the charges against him unaware of whether the facts and circumstances of his case would lead to proving attempted rape, kidnapping, robbery (and/or even perhaps attempted robbery, which was also proposed and discussed by the State's counsel). The very idea that the State can allege unspecified criminal activity, present factual evidence, and then seek to define the specific crime in the aftermath of such evidence is, in fact, contrary to our well-established principles of criminal justice, a hallmark of which is the constitutional guarantee that a criminal defendant be given notice of the crime that he must defend against.

My research yields no other example of a criminal defendant who faces the prospect of trial without prior knowledge of the specific crime he is alleged to have committed and must defend against. In fact, there are scores, if not hundreds, of cases that conclude that a criminal defendant must be so informed. *See, e.g., State v. Nugent,* 243 N.C. 100, 101, 89 S.E.2d 781, 783 (1955) (holding that the constitutional right of a defendant to be informed of the accusation against him requires that the indictment or warrant set out the offense with sufficient certainty to identify it and enable defendant to prepare for trial). *See also State v. Lorenzo,* 147 N.C. App. 728, 734, 556 S.E.2d 625, 629 (2001); *State v. Burroughs,* 147 N.C. App. 693, 695-96, 556 S.E.2d 339, 342 (2001).

If, as the majority asserts, the procedural circumstances of the instant case allow the State to proceed against a felony-murder defendant without identifying the crime he is expected to defend against, would not such a holding run counter to this Court's long history of rejecting criminal charging vehicles that fail to identify the specific criminal offense at issue? Our case books are replete with cases in which indictments and other notice-providing documents have been deemed fatally defective for far lesser reasons than the failure to identify the crime. *See, e.g., State v. Smith,* 267 N.C. 755, 756, 148 S.E.2d 844, 844-45 (1966) (holding that an indictment charging that defendant broke and entered "a certain building occupied by one Chatham County Board of Education, a Government corporation" was fatally defective in failing to identify the premises with suf-

ficient certainty); *State v. Price,* 265 N.C. 703, 704-05, 144 S.E.2d 865, 866-67 (1965) (holding that an indictment that does not incorporate the word "feloniously" or charge that the offense is a felony cannot support a conviction of an offense greater than a misdemeanor); *State v. Overman,* 257 N.C. 464, 468, 125 S.E.2d 920, 924 (1962) (holding that where the indictment charged the name of the injured as "Frank E. Nutley" while the proof at trial showed the injured was "Frank E. Hatley," there was a material variance warranting a nonsuit); and *State v. Finch,* 218 N.C. 511, 511-12 11 S.E.2d 547, 547-48 (1940) (holding that where the name of one of the defendants did not appear in the indictment, it was fatally defective as to him, *notwithstanding that his name appeared on the envelope, that his name was placed on the court dockets prepared for the judge and counsel, and that he was fully informed of the charge against him*).

Thus, while this Court has held that an indictment—either by itself or in tandem with other notice-providing instruments, such as a bill of particulars—may prove insufficient for failing to reference *details* of a particular crime, such as an individual element of the offense, the precise location of an offense, or even whether the alleged offense constituted a felony, the majority here concludes that such instruments will not be deemed deficient if they fail to identity the crime itself. Such a conclusion, in my view, not only defies logic; it is without support under the law. As a consequence, I cannot offer my support to the majority's conclusion.

In the instant case, defendant faced a first-degree murder conviction, and a possible death sentence, if the jury determined that the victim was killed during defendant's commission of a violent felony. The indictment did not specify the underlying felony, and when defendant sought a bill of particulars in order to identify the felony, the State argued it did not have to provide such information and contended that any qualifying felony would eventually emerge from the evidence presented at trial. The trial judge denied defendant's motion and explained to defendant that in all likelihood, he could expect to defend against only two possible offenses—robbery or sex. Then, *after the close of all evidence,* the State proffered as many as four possible underlying felonies, with the trial judge ultimately choosing one—attempted rape—as the basis for the felony murder charge. As a consequence of the foregoing chronology, defendant learned of the crime he would have to defend against at a time when he could no longer plan or mount any defense against it. Such procedure flies in the face of any rational interpretation of our state's constitutional

mandates, which guarantee a criminal defendant the right to pre-trial notice of the crime he is alleged to have committed, and the crime he must prepare to defend against.

In my view, the trial court's failure to ensure that defendant was informed of the crime he would defend against at trial amounted to prejudicial error. As a result, I respectfully dissent from those portions of the majority opinion that address defendant's pre-trial motion for the State to identify the specific underlying felony it intended to prove at trial.